## MOEGELIN v. GULF LIFE INSURANCE CO.
No. 66-75-L.

Circuit Court, Duval County.
October 10, 1966.

Ulmer, Murchison, Kent, Ashby & Ball, Jacksonville, for plaintiff.

Rogers, Towers, Bailey, Jones & Gray, Jacksonville, for defendant.

WILLIAM L. DURDEN, Circuit Judge.

*Partial summary final decree:* This suit has been brought by the beneficiary of a life insurance policy issued by the defendant. The named insured was Albert W. Moegelin, now deceased. The company has admitted its liability for the face amount of the policy. The company denies liability for payment of additional benefits for accidental death in an amount equal to the sum insured of one thousand dollars.

The policy was issued on July 3, 1944, and was fully paid on the date of death of the insured on December 19, 1965.

The policy provides that no additional benefit for death by accidental means will be paid if the death occurred to the insured — "while enrolled in military, naval or allied service in time of war".

It is admitted by the pleadings that the insured was on active duty with the United States Navy stationed at Camp Zama, Japan, when he was involved in an accident in Japan, near his base, in which he received fatal injures.

It is the contention of the defendant that the United States was at that time and for some time prior thereto "engaged in an actual war with the military forces of the Viet Cong in Viet Nam" within the meaning of the exclusionary provisions of the policy.

Thus created is the first issue as to whether or not the Viet Nam conflict is as a matter of law a war.

This is a law suit and it is the law by which it must be determined. Counsel for each of the parties state that this is a case of first impression in Florida and that Florida has no case law on this point. It is true that there appears to be no insurance case in which the question of law has been determined, but the role of the judiciary has been clearly and unequivocally settled by our appellate courts.

In Dubuisson v. Simmons (Fla. 1946), 26 So.2d 438, Mr. Justice Buford stated for the Supreme Court that —

> "*Power is not given to the court under our system of government to determine that a state of war exists* or to determine that a state of war once declared by the proper authority no longer actively continues except when such determination is based upon the affirmative Act of Congress

or the Proclamation of the President or by the adoption of a treaty of peace approved by the Senate." (Italics added.)

Counsel for the plaintiff refers to the Supreme Court case of Lewis v. Peters (Fla. 1953), 66 So.2d 489. In that case the question pending before the court was whether or not the conflict in Korea and the collateral cold war constituted a war within the meaning of statutes and contracts. Associate Justice Holt stated —

*"It is true that legally we are not engaged in a war as courts view it.* \*\*\*

*"Legal war or not,* we must use every means to prepare and marshal our resources to meet and defeat the ugly threat of the communistic cloud that threatens to encompass us and the whole world." (Italics added.)

This decision again indicates that the Florida Supreme Court has adopted the conclusion that war in the legal sense may be declared only by the executive and legislative branches of the federal government in accordance with the United States constitution.

The question is whether we are talking about war in law or war in fact. This distinction is pretty well set forth in 93 Corpus Juris, War and National Defense, §1, *Definition and Nature,* as follows —

War, in the broad sense, is a properly conducted contest of armed public forces, or in a narrower sense, a state of affairs during the continuance of which the parties to the war may legally exercise force against each other. The term "war", in the practical and realistic sense in which it is commonly used, refers to the period of hostilities and not to a technical state of war which may exist after the fighting has ended. It is not necessary, to constitute war, that both parties shall be acknowledged as independent nations or sovereign states, but war may exist where one of the belligerents claims sovereign rights as against the other. The word "war" is to be understood in its ordinary sense, and the popular connotation of the word is not limited to wars formally declared by Congress to be such. War in the material sense is to be distinguished from war in the legal sense.

*In the material sense.* The existence of war in the material sense is evidenced in the use of force by the parties.

*In the legal sense. War, in law, is not a mere contest of physical force, on however large a scale. War in the legal sense* is the state of nations among whom there is an interruption of all pacific relations and a general contestation of arms by authority of the several sovereigns; it is not a mere contest of force, but must be an armed struggle carried on between two political bodies each of which exercises

de facto authority over persons within a determinate territory, and its existence *is determined by the authorized political department of the government*. So, lawful war can never exist without the actual concurrence of the war-making power, but may exist prior to any contest of the armed forces. The courts are bound by a declaration or determination by the proper department of government that a war exists, but until there has been such a declaration or determination the courts cannot take judicial notice of the existence of a war by their government, as discussed infra.

With respect to the Korean conflict, it has been held that the action waged there was not a "war" within what may be termed the constitutional or legal sense of that word, but that the plain, ordinary, and generally accepted meaning of the word "war" is war in fact, and it is clear that there was war in fact in Korea.

*Kinds of war.* War may be public war, or it may be civil war. It has further been held that war may be private war, when it is carried on by individuals, without the authority or sanction of the state of which they are subjects, or mixed war, that which is made on one side by public authority, and on the other by mere private persons; a contest between a nation, as such, and its external enemies coming in the form of pirates or robbers, and it may be solemn or unsolemn war, and general or perfect war, which destroys the national peace and tranquillity, and lays the foundation of every possible act of hostility, or imperfect, partial, or limited war, which does not entirely destroy the public tranquillity, but interrupts it only in some particulars, as in the case of reprisals. (Italics added.)

There is an interesting and pertinent casenote reported in 7 Miami Law Quarterly at page 261. The subject is the legal construction of a war exclusion clause in an insurance policy as a result of the Korean action. That note says in full (footnotes omitted) —

Action to recover on a life insurance policy which provided for the payment of double indemnity for accidental death except if insured was engaged in military, air or naval services in time of war. Held, the Korean action is at most an undeclared war. Since the term "war" is ambiguous, the policy must be construed in favor the insured. Harding v. Pennsylvania Mutual Life Ins. Co., 90 A.2d 589 (Pa. 1952).

The exemption clause used in this policy depends not only upon the status of the individual, but also upon the status of the country when death occurred. Where such a clause is used, merely "entering into" military service in time of war is sufficient to terminate the double indemnity provision, as distinguished from "result" clauses where death must be "caused by" military duties in time of war.

It is well settled that war in its legal sense can never exist without the concurrence of the political departments of the government having the war-making power, and that the power to declare war

is fixed solely in Congress. A nation may prosecute its rights by force without either notice or a formal declaration of war, and the distinction between declared and undeclared war has long been recognized. Until there has been some act or declaration creating or recognizing its existence by a department clothed with the war-making power, there can be no war of which a court can take judicial notice. Thus, in cases arising out of the attack on Pearl Harbor on December 7, 1941, it was held that war did not exist until recognized by the formal declaration by Congress on December 8, 1941.

The instant case is apparently the first reported adjudication on the specific question of whether or not the hostilities in Korea constitute a war of which the courts must take judicial notice. The court did not depart from the well established rule of looking to the political departments of the governments for the determination of a state of war. Nowhere did they find any act of those departments establishing or recognizing the hostilities as anything other than an "Action in Korea" to which our forces have been committed under the authority of the United Nations Charter. The court reasoned that even if the action in Korea should be found to be a war, it is at most an undeclared war. *If the defendant insurance company intended the term "war" to include undeclared war its intentions should have been made clear in unambiguous terms.* This has been done by other insurance companies since the "Pearl Harbor Cases".

Not being concerned with the actualities of the hostilities in Korea, the court's conclusion that they do not constitute a war seems to be well supported. *The case also serves to emphasize that where private parties have occasion to contract with reference to war, the term "war" will be construed in its legal sense unless the parties give it some other definition or meaning by contract."* (Italics added.)

The status of Florida law on this subject is summarized in 34 Florida Jurisprudence, War, §3, entitled *Declaration and Termination of War,* where it is stated —

"The courts do not have power to determine that a state of war exists or to determine that a state of war once declared by the proper authority no longer actively continues, except when the determination is based on an affirmative act of Congress or a proclamation of the President, or on the adoption of a treaty of peace approved by the Senate. Presidential proclamations that the enemy has surrendered fall short of a declaration that a state of war no longer exists.

"The Korean conflict did not, and the 'cold war' does not, legally constitute a state of war."

To this must be added the Viet Nam conflict.

This view accords with logic and law. It controls the decision which must be made in this case. Admittedly, this raises the

question of just what is the Viet Nam conflict. As Associate Judge Holt stated in Lewis v. Peters, supra —

"Yet we cannot blindly close our eyes to the gigantic and deadly struggle in which the whole world is engaged in the so-called cold war for power and domination of the peoples (free or otherwise) of the world, nor can we close our ears to the booming guns, the whine of the shells, the roar of the planes, the clatter of the machine guns, the filth, the dirt, the exhaustion, the suffering, the wounds, the blood, and the dying of our men, and the expenditure of costly material on the battle fronts of Korea, where they gallantly, without thought of cost, defend us, our loved ones and our way of life, and our great Nation from the fanatical assaults of those who would take from us that which we value above life itself, liberty and freedom under our Constitution."

The conflict in Viet Nam is a limited, imperfect, restricted state of hostilities. The existence of such a state of affairs has long been recognized in the history of our country.

The question of whether or not you can have a limited state of hostilities between nations without a formal declaration thereof by Congress was considered by the Supreme Court of the United States in Bas v. Tingy, 1 L. Ed. 731. There the question was whether or not we were actually at war with France. The issue involved was the relationship of certain ships on the high seas in the year 1799. We were unhappy with France but it had been our friend in the fight for Independence and we did not want to go so far as to declare war on it. Therefore, certain acts were passed permitting American ships to defend themselves, to take French ships as hostages and prizes and to re-capture our own ships which may have been taken by the French navy. These hostilities were a result of shipping activities during the French Revolution. We did not want to declare war on France as it was one of the closest friends we had and yet we had to protect ourselves. In determining that France was properly described as an enemy the Supreme Court recognized that war may arise without declaration and that such a status as existed at the time was not only war but public war as Justice Washington in a concurring opinion wrote, "If it be declared in form, it is called solemn, and is of the perfect kind; because one whole nation is at war with another whole nation; and all the members of the nation declaring war are authorized to commit hostilities against all the members of the other, in every place, and under

every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition".

He then went further and stated —

But hostilities may subsist between two nations, more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go further than to the extent of their commission. Still, however, it is a public war, because it is an external contention by force between some of the members of the two nations, authorized by the legitimate powers. It is a war between the two nations, though all the members are not authorized to commit hostilities such as in a solemn war, where the government retains the general power.

Now, if this be the true definition of war let us see what was the situation of the United States in relation to France. In March, 1799, Congress had raised an army, stopped all intercourse with France; dissolved our treaty, built and equipped ships; enjoining the former, and authorizing the latter, to defend themselves against the armed ships of France, to attack them on the high seas, to subdue and take them as prize, and to re-capture armed vessels found in their possession. Here, then, let me ask, what were the technical characters of an American and French armed vessel, combating on the high seas, with a view the one to subdue the other, and to make prize of his property? They certainly were not friends, because there was a contention by force; nor were they private enemies, because the contention was external, and authorized by the legitimate authority of the two governments. If they were not our enemies, I know not what constitutes an enemy.

Mr. Justice Chase in the same case stated —

What then is the nature of the contest subsisting between America and France? In my judgment it is a limited, partial, war. Congress has not declared war in general terms; but Congress has authorized hostilities on the high seas by certain persons in certain cases. There is no authority given to commit hostilities on land; to capture unarmed French vessels, nor even to capture French armed vessels, lying in a French port; and the authority is not given indiscriminately, to every citizen of America, against every citizen of France, but only to citizens appointed by commissioners, or exposed to immediate outrage and violence. So far it is, unquestionably, a partial war; but, nevertheless, it is a public war, on account of the public authority from which it emanates.

He concluded —

Having, then, no hesitation in pronouncing, that a partial war exists between America and France, and that France was an enemy,

within the meaning of the act of March, 1799, my voice must be given for affirming the decree of the circuit court.

Justice Peterson thought and stated that —

The United States and the French republic are in a qualified state of hostility. An imperfect war, or a war, as to certain objects, and to a certain extent, exists between the two nations; and this modified warfare is authorized by the constitutional authority of our country.

So obviously as far back as this case it was recognized that a war could exist for qualified and limited purposes and this is what has occurred in Viet Nam. Later there are cases in the Supreme Court of the United States that make the same distinction with regard to our relationships to Mexico, to Spain, and to Germany at various times in our history. This is what we have in Viet Nam — a limited, qualified, imperfect war.

This distinction was recognized again in the United States Supreme Court case of United States v. The Three Friends, reported at 41 L. Ed., page 897. No one in Jacksonville has lived here very long without knowing something about The Three Friends. This ship was used in running arms to the revolutionary army in Cuba seeking to overthrow the government of Spain. At the time this litigation arose it was not within the best interest of the United States to have declared war against Spain and it had not done so. As Justice Fuller stated —

But it belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intention expressed.

The distinction between recognition of belligerency and recognition of a condition of political revolt, between recognition of the existence of war in a material sense and of war in a legal sense, is sharply illustrated by the case before us. For here the political department has not recognized the existence of a de facto belligerent power engaged in hostility with Spain, but has recognized the existence of insurrectionary warfare prevailing before, at the time, and since this forfeiture is alleged to have been incurred.

Justice Fuller further stated —

In his annual message of December 2, 1895, the President said — "Cuba is again gravely disturbed. An insurrection, in some respects more active than the last preceding revolt, which continued from 1868 to 1878, now exists in a large part of the eastern interior of the island, menacing even some populations on the coast. Besides deranging the commercial exchanges of the island, of which our country takes the

predominant share, this flagrant condition of hostilities, by arousing sentimental sympathy and inciting adventurous support among our people, has entailed earnest effort on the part of this government to enforce obedience to our neutrality laws and to prevent the territory of the United States from being abused as a vantage ground from which to aid those in arms against Spanish sovereignty.

"Whatever may be the traditional sympathy of our countrymen as individuals with a people who seem to be struggling for larger autonomy and greater freedom, deepened as such sympathy naturally must be in behalf of our neighbors, yet the plain duty of their government is to observe in good faith the recognized obligations of international relationship. The performance of this duty should not be made more difficult by a disregard on the part of our citizens of the obligations growing out of their allegiance to their country, which should restrain them from violating as individuals the neutrality which the nation of which they are members is bound to observe in its relations to friendly sovereign states. Though neither the warmth of our people's sympathy with the Cuban insurgents, nor our loss and material damage consequent upon the futile endeavors thus far made to restore peace and order, nor any shock our humane sensibilities may have received from the cruelties which appear to especially characterize this sanguinary and fiercely conducted war, have in the least shaken the determination of the government to honestly fulfill every international obligation, yet it is to be earnestly hoped, on every ground, that the devastation of armed conflict may speedily be stayed and order and quiet restored to the distracted island, bringing in their train the activity and thrift of peaceful pursuits."

The cold war and its limited armed conflicts have existed since shortly after the termination of World War II. There are those who believe it will remain a part of our world civilization for generations. Therefore, one should not lightly determine that we are "in time of war".

This policy is over twenty years old. As is indicated in the decisions the absolute nature of these clauses has been modified to conform to present day situations.

It is therefore, the conclusion of the court that as to liability there is no genuine issue as to any material fact and that the plaintiff is entitled to a judgment or decree as a matter law.

It seems to be clearly established, however, that attorney's fees cannot be so determined, particularly where the two affidavits conflict even in a minor degree.

It is therefore ordered and adjudged that — (1) This cause is set for final hearing at 10 A.M. October 14, 1966, on the issue

of attorney's fees. (2) Counsel for the plaintiff shall submit a proposed final decree at that time.