4 U.S. 37 (____)
4 Dall. 37
Bas, Plaintiff in Error,
versus
Tingy, Defendant in Error.
Supreme Court of United States.

The case was argued by Lewis, and E. Tilghman, for the plaintiff in error, and by Rawle, and W. Tilghman, for the defendant.
*39 The JUDGES delivered their opinions seriatim in the following manner:
MOORE, Justice.
This case depends on the construction of the act, for the regulation of the navy. It is objected, indeed, that the act applies only to future wars; but its provisions are obviously applicable to the present situation of things, and there is nothing to prevent an immediate commencement of its operation.
It is, however, more particularly urged, that the word "enemy" cannot be applied to the French; because the section in which it is used, is confined to such a state of war, as would authorise a re-capture of property belonging to a nation in amity with the United States, and such a state of war, it is said, does not exist between America and France. A number of books have been cited to furnish a glossary on the word enemy; yet, our situation is so extraordinary, that I doubt whether a parallel case can be traced in the history of nations. But, if words are the representatives of ideas, let me ask, by what other word the idea of the relative situation of America and France could be communicated, than by that of hostility, or war? And how can the characters of the parties engaged in hostility or war, be otherwise described than by the denomination of enemies? It is for the honour and dignity of both nations, therefore, that they should be called enemies; for, it is by that description alone, that either could justify or excuse, the scene of bloodshed, depredation and confiscation, which has unhappily occurred; and, surely, congress could only employ the language of the act of June 13, 1798, towards a nation whom she considered as an enemy.
Nor does it follow, that the act of March 1799, is to have no operation, because all the cases in which it might operate, are not in existence at the time of passing it. During the present hostilities, it affects the case of re-captured property belonging to our own citizens, and in the event of a future war it might also be applied to the case of re-captured property belonging to a nation in amity with the United States. But it is further to be remarked, that all the expressions of the act may be satisfied, even at this very time: for by former laws the re-capture of property, belonging to persons resident within the United States is authorised; those residents may be aliens; and, if they are subjects of a nation in amity with the United States, they answer completely the description of the law.
*40 The only remaining objection, offered on behalf of the plaintiff in error, supposes, that, because there are no repealing or negative words, the last law must be confined to future cases, in order to have a subject for the first law to regulate. But if two laws are inconsistent, (as, in my judgment, the laws in question are) the latter is a virtual repeal of the former, without any express declaration on the subject.
On these grounds, I am clearly of opinion, that the decree of the Circuit Court ought to be affirmed.
WASHINGTON, Justice.
It is admitted, on all hands, that the defendant in error is entitled to some compensation; but the plaintiff in error contends, that the compensation should be regulated by the act of the 28th June 1798, (4 vol. p. 154. s. 2.) which allows only one-eighth for salvage; while the defendant in error refers his claim to the act of the 2d March, (ibid. 456. s. 7.) which makes an allowance of one-half, upon a re-capture from the enemy, after an adverse possession of ninety-six hours.
If the defendant's claim is well founded, it follows, that the latter law must virtually have worked a repeal of the former; but this has been denied, for a variety of reasons:
1st. Because the former law relates to re-captures from the French, and the latter law relates to re-captures from the enemy; and, it is said, that "the enemy" is not descriptive of France, or of her armed vessels, according to the correct and technical understanding of the word.
The decision of this question must depend upon another; which is, whether, at the time of passing the act of congress of the 2d of March 1799, there subsisted a state of war between the two nations? It may, I believe, be safely laid down, that every contention by force between two nations, in external matters, under the authority of their respective governments, is not only war, but public war. If it be declared in form, it is called solemn, and is of the perfect kind; because one whole nation is at war with another whole nation; and all the members of the nation declaring war, are authorised to commit hostilities against all the members of the other, in every place, and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition.
But hostilities may subsist between two nations more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorised to commit hostilities, act under special authority, and can go no farther than to the extent of their commission. Still, however, it is public war, because it is an external contention by force, between some of the members of the two nations, authorised by the legitimate powers. It is a war between the two nations, though all the *41 members are not authorised to commit hostilities such as in a solemn war, where the government restrain the general power.
Now, if this be the true definition of war, let us see what was the situation of the United States in relation to France. In March 1799, congress had raised an army; stopped all intercourse with France; dissolved our treaty; built and equipt ships of war; and commissioned private armed ships; enjoining the former, and authorising the latter, to defend themselves against the armed ships of France, to attack them on the high seas, to subdue and take them as prize, and to re-capture armed vessels found in their possession. Here, then, let me ask, what were the technical characters of an American and French armed vessel, combating on the high seas, with a view the one to subdue the other, and to make prize of his property? They certainly were not friends, because there was a contention by force; nor were they private enemies, because the contention was external, and authorised by the legitimate authority of the two governments. If they were not our enemies, I know not what constitutes an enemy.
2d. But, secondly, it is said, that a war of the imperfect kind, is more properly called acts of hostility, or reprizal, and that congress did not mean to consider the hostility subsisting between France and the United States, as constituting a state of war.
In support of this position, it has been observed, that in no law prior to March 1799, is France styled our enemy, nor are we said to be at war. This is true; but neither of these things were necessary to be done: because as to France, she was sufficiently described by the title of the French republic; and as to America, the degree of hostility meant to be carried on, was sufficiently described without declaring war, or declaring that we were at war. Such a declaration by congress, might have constituted a perfect state of war, which was not intended by the government.
3d. It has, likewise, been said, that the 7th section of the act of March 1799, embraces cases which, according to pre-existing laws, could not then take place, because no authority had been given to re-capture friendly vessels from the French; and this argument was strongly and forcibly pressed.
But, because every case provided for by this law was not then existing, it does not follow, that the law should not operate upon such as did exist, and upon the rest whenever they should arise. It is a permanent law, embracing a variety of subjects, not made in relation to the present war with France only, but in relation to any future war with her, or with any other nation. It might then very properly allow salvage for re-capturing of American vessels from France, which had previously been authorised by law, though it could not immediately apply to the vessels of friends: and whenever such a war should exist between the United States and France, or any other nation, as according to the law of nations, *42 or special authority, would justify the re-capture of friendly vessels, it might on that event, with similar propriety, apply to them; which furnishes, I think, the true construction of the act.
The opinion which I delivered at New-York, in Talbot v. Seaman, was, that although an American vessel could not justify the re-taking of a neutral vessel from the French, because neither the sort of war that subsisted, nor the special commission under which the American acted, authorised the proceeding; yet, that the 7th sect. of the act of 1799, applied to re-captures from France as an enemy, in all cases authorised by congress. And on both points, my opinion remains unshaken; or rather has been confirmed by the very able discussion which the subject has lately undergone in this Court, on the appeal from my decree. Another reason has been assigned by the defendant's counsel, why the former law is not to be regarded as repealed by the latter, to wit: that a subsequent affirmative general law cannot repeal a former affirmative special law, if both may stand together. This ground is not taken, because such an effect involves an indecent censure upon the legislature for passing contradictory laws, since the censure only applies where the contradiction appears in the same law; and it does not follow, that a provision which is proper at one time may not be improper at another, when circumstances are changed: but the ground of argument is, that a change ought not to be presumed. Yet, if there is sufficient evidence of such a change in the legislative will, and the two laws are in collision, we are forced to presume it.
What then is the evidence of legislative will? In fact and in law we are at war: an American vessel fighting with a French vessel, to subdue and make her prize, is fighting with an enemy accurately and technically speaking: and if this be not sufficient evidence of the legislative mind, it is explained in the same law. The sixth and the ninth sections of the act speak of prizes, which can only be of property taken at sea from an enemy, jure belli; and the 9th section speaks of prizes as taken from an enemy, in so many words, alluding to prizes which had been previously taken: but no prize could have been then taken except from France: prizes taken from France were, therefore, taken from the enemy. This then is a legislative interpretation of the word enemy; and if the enemy as to prizes, surely they preserve the same character as to re-captures. Besides, it may be fairly asked, why should the rate of salvage be different in such a war as the present, from the salvage in a war more solemn or general? And it must be recollected, that the occasion of making the law of March 1799, was not only to raise the salvage, but to apportion it to the hazard in which the property re-taken was placed; a circumstance for which the former salvage law had not provided.
The two laws, upon the whole, cannot be rendered consistent, unless the Court could wink so hard as not to see and know, that *43 in fact, in the view of congress, and to every intent and purpose, the possession by a French armed vessel of an American vessel, was the possession of an enemy: and, therefore, in my opinion, the decree of the Circuit Court ought to be affirmed.
CHASE, Justice.
The Judges agreeing unanimously in their opinion, I presumed that the sense of the Court would have been delivered by the president; and therefore, I have not prepared a formal argument on the occasion. I find no difficulty, however, in assigning the general reasons, which induce me to concur in affirming the decree of the Circuit Court.
An American public vessel of war re-captures an American merchant vessel from a French privateer, after 96 hours possession, and the question is stated, what salvage ought to be allowed? There are two laws on the subject: by the first of which, only one-eighth of the value of the re-captured property is allowed; but by the second, the re-captor is entitled to a moiety. The re-capture happened after the passing of the latter law: and the whole controversy turns on the single question, whether France was at that time an enemy? If France was an enemy, then the law obliges us to decree one half of the value of ship and cargo for salvage: but if France was not an enemy, then no more than one-eighth can be allowed.
The decree of the Circuit Court (in which I presided) passed by consent; but although I never gave an opinion, I have never entertained a doubt on the subject. Congress is empowered to declare a general war, or congress may wage a limited war; limited in place, in objects, and in time. If a general war is declared, its extent and operations are only restricted and regulated by the jus belli, forming a part of the law of nations; but if a partial war is waged, its extent and operation depend on our municipal laws.
What, then, is the nature of the contest subsisting between America and France? In my judgment, it is a limited, partial, war. Congress has not declared war in general terms; but congress has authorised hostilities on the high seas by certain persons in certain cases. There is no authority given to commit hostilities on land; to capture unarmed French vessels, nor even to capture French armed vessels lying in a French port; and the authority is not given, indiscriminately, to every citizen of America, against every citizen of France; but only to citizens appointed by commissions, or exposed to immediate outrage and violence. So far it is, unquestionably, a partial war; but, nevertheless, it is a public war, on account of the public authority from which it emanates.
There are four acts, authorised by our government, that are demonstrative a of state of war. A belligerent power has a right, by the law of nations, to search a neutral vessel; and, upon *44 suspicion of a violation of her neutral obligations, to seize and carry her into port for further examination. But by the acts of congress, an American vessel it authorised: 1st. To resist the search of a French public vessel: 2d. To capture any vessel that should attempt, by force, to compel submission to a search: 3d. To re-capture any American vessel seized by a French vessel; and 4th. To capture any French armed vessel wherever found on the high seas. This suspension of the law of nations, this right of capture and re-capture, can only be authorised by an act of the government, which is, in itself, an act of hostility. But still it is a restrained, or limited, hostility; and there are, undoubtedly, many rights attached to a general war, which do not attach to this modification of the powers of defence and aggression. Hence, whether such shall be the denomination of the relative situation of America and France, has occasioned great controversy at the bar; and, it appears, that Sir William Scott, also, was embarrassed in describing it, when he observed, that "in the present state of hostility (if so it may be called) between America and France," it is the practice of the English Court of Admiralty to restore, re-captured American property, on payment of a salvage. Rob. Rep. 54. The Santa Cruz. But, for my part, I cannot perceive the difficulty of the case. As there may be a public general war, and a public qualified war; so there may, upon correspondent principles, be a general enemy, and a partial enemy. The designation of "enemy" extends to a case of perfect war; but as a general designation, it surely includes the less, as well as the greater, species of warfare. If congress had chosen to declare a general war, France would have been a general enemy; having chosen to wage a partial war, France was, at the time of the capture, only a partial enemy; but still she was an enemy.
It has been urged, however, that congress did not intend the provisions of the act of March 1799, for the case of our subsisting qualified hostility with France, but for the case of a future state of general war with any nation: I think, however, that the contrary appears from the terms of the law itself, and from the subsequent repeal. In the 9th section it is said, that all the money accruing, "or which has already accrued from the sale of prizes," shall constitute a fund for the half-pay of officers and seamen. Now, at the time of making this appropriation, no prizes, (which ex vi termini implies a capture in a state of war) had been taken from any nation but France, those which had been taken, were not taken from France as a friend: they must consequently have been taken from her as an enemy; and the retrospective provision of the law can only operate on such prizes. Besides, when the 13th section regulates "the bounty given by the United States on any national ship of war, taken from the enemy, and brought into port," it is obvious, that even if the bounty has no relation to previous captures, it must operate from the moment of passing the *45 act, and embraces the case of a national ship of war taken from France as an enemy, according to the existing qualified state of hostilities. But the repealing act, passed on the 3d of March 1800, (subsequent to the re-capture in the present case) ought to silence all doubt, as to the intention of the legislature: for, if the act of March 1799, did not apply to the French republic, as an enemy, there could be no reason for altering, or repealing, that part of it, which regulates the rate of salvage on re-captures.
The acts of congress have been analysed to show, that a war is not openly denounced against France, and that France is no where expressly called the enemy of America: but this only proves the circumspection and prudence of the legislature. Considering our national prepossessions in favour of the French republic, congress had an ardous task to perform, even in preparing for necessary defence, and just retaliation. As the temper of the people rose, however, in resentment of accumulated wrongs, the language and the measures of the government became more and more energetic and indignant; though hitherto the popular feeling may not have been ripe for a solemn declaration of war; and an active and powerful opposition in our public councils, has postponed, if not prevented that decisive event, which many thought would have best suited the interest, as well as the honour of the United States. The progress of our contest with France, indeed, resembles much the progress of our revolutionary contest; in which, watching the current of public sentiment, the patriots of that day proceeded, step by step, from the supplicatory language of petitions for a redress of grievances, to the bold and noble declaration of national independence.
Having, then, no hesitation in pronouncing, that a partial war exists between America and France, and that France was an enemy, within the meaning of the act of March 1799, my voice must be given for affirming the decree of the Circuit Court.
PATERSON, Justice.
As the case appears on the record, and has been accurately stated by the counsel, and by the judges, who have delivered their opinions, it is not necessary to recapitulate the facts. My opinion shall be expressed in a few words. The United States and the French republic are in a qualified state of hostility. An imperfect war, or a war, as to certain objects, and to a certain extent, exists between the two nations; and this modified warfare is authorised by the constitutional authority of our country. It is a war quoad hoc. As far as congress tolerated and authorised the war on our part, so far may we proceed in hostile operations. It is a maritime war; a war at sea as to certain purposes. The national armed vessels of France attack and capture the national armed vessels of the United States; and the national armed vessels of the United States are expressly authorised and directed to attack, subdue, and take, the national armed vessels *46 of France, and also to re-capture American vessels. It is therefore a public war between the two nations, qualified, on our part, in the manner prescribed by the constitutional organ of our country. In such a state of things, it is scarcely necessary to add, that the term "enemy," applies; it is the appropriate expression, to be limited in its signification, import, and use, by the qualified nature and operation of the war on our part. The word enemy proceeds the full length of the war, and no farther. Besides, the intention of the legislature as to the meaning of this word, enemy, is clearly deducible from the act for the government of the navy, passed the 2d of March 1799. This act embraces the past, present, and future, and contains passages, which point the character of enemy at the French, in the most clear and irresistible manner. I shall select one paragraph, namely, that which refers to prizes taken by our public vessels, anterior to the passing of the latter act. The word prizes in this section can apply to the French, and the French only. This is decisive on the subject of legislative intention.
By the COURT:
Let the decree of the Circuit Court be affirmed.