Malcolm A. BERK, Plaintiff,

v.

Melvin LAIRD, individually, and as Secretary of Defense of the United States, Stanley S. Resor, individually, and as Secretary of the Army of the United States, and Col. T. F. Spencer, individually, and as Chief of Staff, United States Army Engineers Center, Fort Belvoir, Defendants.

No. 70-C-697.

United States District Court,
E. D. New York.

Sept. 16, 1970.

Leon Friedman, Burt Neuborne, Theodore C. Sorensen, Kay Ellen Hayes, New York City, for plaintiff, Norman Dorsen, Marc Luxemburg, Peter P. Smith, Mark Alcott, New York City, of counsel.

Edward R. Neaher, U. S. Atty., E.D. N.Y., Brooklyn, for defendants, Robert A. Morse, Chief Asst. U. S. Atty., James D. Porter, Jr., Cyril Hyman, Robert Rosenthal, Asst. U. S. Attys., of counsel.

## MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

JUDD, District Judge.

An action for an injunction against sending an enlisted Army man to Vietnam challenges the constitutional basis for the presence of United States armed forces in South Vietnam. The case is before the court on defendants' motion to dismiss on the three grounds of lack of jurisdiction, failure to state a valid claim, and summary judgment for lack of genuine issues of material fact.

### General Outline

The following controlling conclusions seem appropriate on the basis of the pleadings, affidavits, memoranda and public documents which the court has studied:

1. From the early days of our republic, there has been a recognized distinction between a "perfect war" or total war, initiated by a formal declaration of war, and an "imperfect war" or partial war, which involves military action authorized by Congress without a formal declaration of war.

2. There is no doubt that Congress has authorized the President to send members of the armed forces to South Vietnam to engage in hostilities.

3. The question whether Congress should declare total war or rely on some other mode of authorizing military action is a political question, on which a court should not overrule Congress' determination.

4. The controversies between the parties raise only questions of law, and no disputes of any material fact.

After setting forth the posture of the case, and the facts of record, the court will elaborate upon the foregoing propositions.

### The Posture of the Case

At an earlier stage, this court denied a motion for a preliminary injunction, on the ground, among others, that prior

court decisions indicated that the power of the President as Commander-in-Chief to send the armed forces abroad was a political question, which courts should not decide.

An appeal was taken and decided by the Court of Appeals on June 19, 1970. The Court of Appeals affirmed the denial of a preliminary injunction, but held that the question of the President's power to commit the armed forces to action involved a justiciable question, and remanded the case for further proceedings.

The Court of Appeals recognized that even a justiciable claim may not be decided if it involves a political question without "judicially discoverable and manageable standards for resolving it." The quotation was taken from Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). After referring to Congress' actions concerning the Vietnam hostilities, "in part expressly through the Gulf of Tonkin Resolution and impliedly through appropriations and other acts in support of the project over a period of years," the Court of Appeals left it open for plaintiff's counsel "to suggest a set of manageable standards and escape the likelihood that his particular claim about this war at this time is a political question." 429 F.2d 302, p. 305.

The Court of Appeals extended for seven days a temporary stay which Mr. Justice White of the Supreme Court had previously granted. On June 26, 1970, the Supreme Court denied any further stay of plaintiff's deployment. 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785.

This court treats the Court of Appeals' opinion as holding that jurisdiction exists to consider plaintiff's claim, thus eliminating the first ground of defendants' motion.

Before any further proceedings were had in this case, another attack on the transfer of a soldier to Vietnam came before Judge Dooling of this court. Orlando v. Laird, 317 F.Supp. 1013. He denied a preliminary injunction against deployment to Vietnam, after considering extensive documentary material and hearing arguments of counsel. While his conclusion is persuasive to another judge of the same court, it does not eliminate the necessity of giving full consideration to this case.

### Plaintiff's Proposed "Manageable Standards"

Plaintiff suggests three different categories of military action, requiring different measures of legislative-executive cooperation. The first category includes various types of emergency action, such as repelling an attack on the United States or protecting American citizens from attack, which the President may take without any action by Congress. In the second category are placed other acts of war against organized states, and aid in protecting any other nation from attack; plaintiff says these acts may be authorized or ratified by any explicit Congressional action, but not by appropriations acts, unless such acts "explicitly and by their own terms authorize, sanction and/or direct military action."

The third category is described as "hostilities of the highest magnitude," as measured by numbers of men involved, amounts of equipment, and use of the most powerful weapons. Such actions, plaintiff says, cannot be initiated without *prior* explicit Congressional authority. Even if the military action began in the first or second category, plaintiff says that the action may not be escalated to the highest level without prior explicit action by Congress. Plaintiff says that the third category of military action can be authorized only by:

> Prior explicit Congressional approval either through a declaration of general war or limited war or treaty, law or resolution explicitly authorizing the use of military force. * * *"

Plaintiff asserts that neither the Gulf of Tonkin Resolution nor the appropriation acts and other legislative acts cited by the government constitute *prior ex-*

*plicit* authorization for the use of military force.

In number of men involved (accepting for this purpose the 3,000,000 figure used by plaintiff), numbers of killed (42,000) and wounded (280,000), amounts of equipment (half our entire air force), and amounts of money expended (over $100 billion), the Vietnam conflict ranks as a major war. There may be a question whether it involves "the highest magnitude" of military action, since it has not been extended to a land invasion of North Vietnam, or a blockade of the North Vietnam coast, among other potential forms of escalation. Nevertheless, the case will be considered on the basis of its belonging in the third category listed by plaintiff, without thereby accepting his requirement of *prior* explicit Congressional authority.

### The Facts of this Case

Plaintiff enlisted in the United States Army on June 27, 1969, for a three-year term which will expire on June 27, 1972. He is now twenty years old, and is a private first class. Prior to his enlistment, he lived in Queens County, New York. He was at home on leave when he filed his complaint.

He was ordered by defendant Spencer to report to Fort Dix on June 7, 1970, for shipment to South Vietnam. He began this action on June 3, 1970. After the Supreme Court's denial of a stay of his deployment, he was in fact sent to Vietnam and is still there.

### Plaintiff's Proposed Expert Testimony

Affidavits or statements of five experts have been submitted in opposition to defendants' motion. No reply affidavits having been filed, the court must assume that the facts stated in the affidavits for plaintiff are true, although the inferences and conclusions drawn from those facts need not be accepted.

*Richard E. Fenno, Jr.,* Professor of Political Science at the University of Rochester, asserts that the fair meaning of appropriations bills is that they do not encompass major declarations of policy. He cites rules of House and Senate which are designed to prevent declarations of policy being included in appropriations bills, and states that "Many motives including considerations of common humanity and procedural propriety underlie a Congressman's determination to vote for a particular military appropriations bill." Therefore, he says, a bill should explicitly state that it empowers the executive to commit troops abroad, before it can overcome the strong presumption against such a determination of policy.

*Fred L. Israel,* Associate Professor of History at the College of the City of New York, offers to supply testimony on the manageable standards appropriate to determine what joint executive-legislative action is necessary to authorize various kinds of activity. He would also testify about the pressures of domestic policy and world affairs that must be considered in determining such "manageable standards."

*George McT. Kahin,* Professor of Government at Cornell University, provides a detailed history of foreign involvements in Vietnam since the beginning of the French presence in the nineteenth century. France did not "pacify" all of Vietnam until 1917. Japan occupied Indo-China during World War II, and the United States supported the Vietnamese Independence League, or Vietminh, in order to oppose the Japanese. After the Japanese surrender in 1945, Ho Chi Minh on September 2, 1945 proclaimed Vietnam's independence. The French in 1946 recognized the Democratic Republic of Vietnam as a free state within the Indo-Chinese Federation and the French Union. However, the French Viceroy in Indo-China soon set up a separate government in Cochin China, part of South Vietnam, and friction with the Vietminh developed. The French fought from 1946 to 1954 in an unsuccessful effort to defeat the Vietminh. In 1948, the French

appointed Bao Dai to head a new government; he had been Emperor of Annam, and had been made head of an earlier Vietnamese government by the Japanese. The United States recognized Bao Dai's government in 1950, and began to supply military and economic assistance to the French, reaching over $1 billion by 1954. However, President Eisenhower refused to order military intervention because he could not get the requisite backing from Congress.

In May, 1954, there were 685 U. S. ground forces in Vietnam as "advisers." After the surrender of the French at Dienbienphu in May of 1954, a conference was held in Geneva concerning the treatment of Vietnam. The participating governments were France, Laos, Cambodia, the People's Republic of China, the United Kingdom, the Soviet Union, the Bao Dai state (designated as "the State of Viet Nam"), and the Democratic Republic of Viet Nam. Anthony Eden and Vyacheslav Molotov were co-chairmen of the conference. The United States was not a member of the conference, but was represented by Walter Bedell Smith.

The first "Geneva Agreement" was one "on the Cessation of Hostilities in Viet Nam," between the French Union Forces in Indo-China and the People's Army of Viet Nam. It provided for a "provisional military demarcation line" and a demilitarized zone at about the 17th parallel (Art. 1), for a cease-fire beginning on July 27, 1954 (Art. 11), and for the withdrawal of each party's forces from the areas designated in the agreement, "Pending the general elections which will bring about the unification of Viet Nam." (Art. 14). Provision was made for a Joint Commission of the two parties (Arts. 30, 31), and for an International Commission comprising India, Canada and Poland, to supervise the execution of the agreements. (Arts. 34–36).

The second relevant document to come out of the Geneva Conference was a "Final Declaration," adopted orally by all the parties named above, except the Bao Dai state, which expressed reservations, and the United States. This Declaration endorsed the armistice agreement, and took note of various clauses in the agreement. The Geneva Conference, in the Declaration, recited that the International Commission would supervise general elections to be held in July, 1956, with consultations on the subject to begin in July, 1955.

Ambassador Smith stated that the United States was not prepared to join in the Declaration, but that it took note of the Geneva Agreements, and stated, "that it will refrain from the threat or the use of force to disturb them," and that:

> "We share the hope that the agreement will permit Cambodia, Laos and Viet Nam to play their part in full independence and sovereignty, in the peaceful community of nations, and will enable the peoples of that area to determine their own future." Command Paper 9239, pp. 446–47.

The documents supplied by Professor Kahin are British copies. Command Paper 9329, 1959, pp. 422–450.

The general elections for all Vietnam were not held. Professor Kahin asserts that the United States violated the Geneva Agreements by supporting a separate state in South Vietnam, and backing a new government headed by Ngo Dinh Diem, who stated (incorrectly) that he was not bound by the Geneva Agreement, and refused to discuss the question of elections. Repressive actions by the Diem government led to the growth of the National Liberation Force, or Vietcong, who had no help from Hanoi until late in 1960, according to Professor Kahin. Because the Diem government was in danger of collapse, President Kennedy in 1961 increased the economic and military aid, bringing the number of military advisers to 18,000 during his time in office. Diem was murdered in November, 1963, a few weeks before President Kennedy's assassination.

Professor Kahin asserts that President Johnson in January, 1964 encouraged the

new Saigon government of General Duong Van Minh and later of General Nguyen Khanh to continue to seek victory against the Vietcong, in spite of suggestions from United Nations Secretary General U Thant that Ho Chi Minh was willing to talk about a settlement of the conflict.

On August 2, 1964, North Vietnamese torpedo boats attacked the U. S. destroyer "Maddox" while it was on patrol in the Gulf of Tonkin. The United States version was that the attack was unprovoked, but Hanoi asserted that it was in retaliation for bombardment of nearby North Vietnamese islands. A second attack on U. S. destroyers on August 4 was reported by United States sources, but denied by North Vietnam. President Johnson then told Congressional leaders that he was going to ask them to pass a resolution in response to this crisis, and he followed this up with a television broadcast and a message to Congress urging a clear statement to "hostile nations" that the United States would continue to protect its national interests.

At this time, over 26,000 men had infiltrated into South Vietnam from the North, and the average rate of infiltration was about 1,000 per month, according to the exhibits attached to the affidavit. Professor Kahin states that the Vietcong controlled 42 per cent of Vietnam's villages, but that this success had been obtained "without the help of *military units* from Hanoi." (Emphasis added).

Renewed efforts at peace negotiations by U. N. Secretary General U Thant were made after the November, 1964 Presidential election, but were rebuffed by the United States after Secretary of Defense McNamara argued that negotiations would have a demoralizing effect on Saigon.

Escalation of United States military activity was slight after the Gulf of Tonkin incident, but more rapid after a Vietcong attack in early 1965 on American barracks in Pleiku, where 8 were killed and 126 wounded. Bombing raids were begun against logistical centers in the North in February and March, 1965. Infiltration from the North was about 4,500 per month during 1965. By December, 1965, there was air bombardment of the "Ho Chi Minh trail" in Laos from airfields in Thailand, and pursuit of retreating enemy troops into Cambodia. Non-lethal gas was used in 1966 to drive Vietcong from tunnels. By August, 1966, the weekly tonnage of bombs exceeded the amount dropped on Germany at the peak of World War II. A Congressional report in 1966 indicated that there were two civilian casualties for every Vietcong casualty. By mid-1966, United States weekly casualty totals frequently exceeded those of the South Vietnamese.

United States troop strength in Vietnam was only 23,000 in early 1965, but jumped to over 375,000 by the end of 1966, with an additional 29,000 from Australia, New Zealand, and South Korea.

The foregoing capsulized history is pertinent background for consideration of the Congressional actions described later in the opinion. The court has made no objective determination of facts, but used the version given by plaintiff's expert.

*Professor Marcus Raskin,* co-director of the Institute for Policy Studies in Washington, D. C., also gave a history of the Indo-China War from 1946 to 1967, with figures showing the escalation of United States forces during the years 1965, 1966 and 1967. He related that President Truman sent a military mission there in 1950 to work with the French force, and that $2.2 billion of military and economic aid was provided between June, 1950 and May, 1954. President Eisenhower believed in 1954 that he would need explicit Congressional approval before committing troops or naval or air forces to Vietnam, although some of his administration favored our assuming France's role. The Executive nevertheless justified sending additional military aid on the theory that the North Vietnamese had violated the Geneva

Agreement. The total increased to 773 by the end of President Eisenhower's administration, and to 16,500 by the end of President Kennedy's time in office. Figures for later years are set forth. He asserts that bombing attacks by U. S. forces in 1965 were not really retaliation for Vietcong attacks, but part of a pre-determined military policy.

At the present time, over half of the nation's entire airpower is allocated to military activities in Southeast Asia. Professor Raskin describes extensive defoliation and crop destruction, forced transfer of entire villages, civilian hardship and deaths, torture of war prisoners, and the use of sophisticated aerial weapons.

*Don Wallace, Jr.,* Associate Professor of Law at Georgetown University Law Center, offered to testify about how appropriations bills are handled and the inferences to be drawn from them. He emphasizes that rules against including substantive legislation in appropriations bills are necessary in order to prevent the Appropriations Committees from encroaching on the powers of the substantive committees. He quotes statements by Congressmen during the debate on appropriations for Vietnam, that they were voting for the bills because they believed policy issues should not be decided through appropriations bills, although they were opposed to escalation of the war in Vietnam. He points out that, of eighteen laws for military expenditures since 1964 (eight authorization bills and ten appropriations bills), *five contained no reference to Vietnam,* and that the legislative history leaves substantial question as to whether any of them constitute authorization or ratification of the Executive decision to carry on hostilities in Vietnam. He quotes many members of Congress as stating that they did not endorse the United States policies in Vietnam, but were voting to support the forces who were there.

### The Power to Declare War

Congress' power to declare war is set forth in Article I, Section 8 of the United States Constitution. The pertinent language reads:

"The Congress shall have Power to lay and collect Taxes * * *.

"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

"To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

"To provide and maintain a Navy;

"To make rules for the government and regulation of the Land and Naval Forces; "

It will be noted that Congress has constitutional authority not only to declare war, but to make rules governing the armed forces.

1.  *The early distinction between total war and partial war.*

Although France under King Louis XVI had supported America's revolutionary efforts against England, the relations between the young nation that emerged here and the newer French Republic soon became unfriendly. The Fifth Congress, in 1798, authorized the President to issue instructions to United States armed vessels to seize any armed vessel that had committed depredations on vessels belonging to the United States, or that was hovering on the coasts for such purpose. 5th Cong.Sess. II, c. 48, 1 Stat. 561. Other acts of the same Congress suspended commercial intercourse between the United States and France (c. 53, 1 Stat. 565) and authorized U.S. merchant vessels to defend themselves against French vessels (c. 60, 1 Stat. 572).

The 1798 statutes were treated by the Supreme Court as authorizing a state of partial war between the United States and France. The Eliza (Bas v. Tingy), 4 U.S.(Dall.) 37, 1 L.Ed. 731 (1800). The case arose on a claim for salvage for retaking an American ship which had been taken by the French. It was necessary to find that the ship had been taken

by an "enemy," to justify a salvage award. Justice Washington acknowledged that France was nowhere described as an "enemy," but held that there was "war of the imperfect kind." (p. 41). He distinguished between a "solemn" or "perfect" war, declared as such, and a limited or "imperfect" war. (p. 40). In the first case all members of one nation are at war with all members of the other nation; in the second case, those who are authorized to commit hostilities act "under special authority." (*ibid.*) Justice Chase pointed out that the popular "prepossessions" in favor of France led Congress not to want to declare a "solemn" war. Although Congress had not used the word "war," all the Justices agreed that there was a situation of war (Justice Moore, p. 39), albeit "a limited, partial war" (Justice Chase, p. 43), or an "imperfect war" (Justice Paterson, p. 45). See to the same effect The Amelia (Talbot v. Seeman, 5 U.S.(Cranch) 1, 2 L.Ed. 15 (1801), in which Chief Justice Marshall said that "congress may authorize general hostilities * * * or partial hostilities" (p. 28).

Other early authorizations of limited hostilities were statutes authorizing the seizure of vessels of Tripoli (2 Stat. 129, Feb. 6, 1802) and Algiers (3 Stat. 230, March 3, 1815). Those statutes referred to the commencement of "predatory warfare against the United States" by the regency of Tripoli, and the Dey of Algiers, and authorized the President "to cause to be done all such other acts of precaution or hostility as the state of war will justify." Only Tripoli ever declared war on the United States, and the Acts of Congress were not regarded as declarations of "solemn" war.

An appendix to plaintiff's memorandum of law lists 159 instances of use of United States Armed Forces abroad from 1798 to 1945, of which only six involved formal declarations of war by either side. Sen.Comm. on For.Rel. and on Armed Services, Hearings on the Situation in Cuba, 87th Congr.2d Sess., Sept. 17, 1962, pp. 82–87.

The concept of an imperfect war was again discussed in Montoya v. United States, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901). There the court held that certain depredations by Indians were not within a Congressional act providing indemnity for property taken by Indians, because the particular taking was an act of war. Indian wars were put in the class of "imperfect" wars as described in Bas v. Tingy. See 180 U.S. at 267, 21 S.Ct. 358.

More recently, Congress by Joint Resolution determined that President Wilson was "justified in the employment of the armed forces of the United States to enforce his demand for unequivocal amends for certain affronts and indignities committed against the United States" by Mexico. 38 Stat. 770, April 22, 1914. The resolution disclaimed "any purpose to make war upon Mexico."

In the years since World War II, Congress has authorized the President, by a series of Resolutions, to use the armed forces as he might deem necessary to protect Formosa and the Pescadores against armed attack (Pub.L. 84–4, 69 Stat. 7, Jan. 29, 1955), to assist any nation in the Middle East requesting assistance against armed communist aggression (Pub.L. 85–7, 71 Stat. 5, Mar. 9, 1957), to prevent "the Marxist-Leninist regime in Cuba" from extending its aggressive or subversive activities to any part of this hemisphere (Pub.L. 87–733, 76 Stat. 697, Oct. 3, 1962), and to prevent any violation by the Soviet Union of the right of access to Berlin (House Conc.Res. 570, 87th Cong., 76 Stat. 1429, passed by Senate Oct. 10, 1962). The Senate Foreign Relations Committee stated that "the exact line of authority between the President and the Congress" had been "in doubt for the past 160 years." Sen.Rep. 175, Mar. 14, 1951, partially reprinted in *Background Information Relating to Peace and Security in Southeast Asia and Other Areas*, Sen. Comm. on For.Rel., Jan. 1970, p. 35.

The resolutions just listed, fortunately, did not give rise to the extent of military

activity which has taken place in Vietnam, but they are instances of Congressional authorization of partial war, and are pertinent background for the Gulf of Tonkin Resolution described in the next section of this opinion.

The language used in declarations of total war has been quite different. At the outset of the War of 1812, Congress stated (2 Stat. 755, approved June 18, 1812):

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That war be and the same is hereby declared to exist between the United Kingdom of Great Britain and Ireland and the dependencies thereof, and the United States of America and their territories; and that the President of the United States is hereby authorized to use the whole land and naval force of the United States to carry the same into effect, \* \* \*."

Similarly, after Pearl Harbor, Congress stated (Pub.L. 328, 77th Congr., 55 Stat. 795, approved Dec. 8, 1941):

> "Whereas the Imperial Government of Japan has committed unprovoked acts of war against the Government and the people of the United States of America: Therefore be it

> "*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the state of war between the United States and the Imperial Government of Japan which has thus been thrust upon the United States is hereby formally declared; and the President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial Government of Japan; and, to bring the conflict to a successful termination, all of the resources of the country are hereby pledged by the Congress of the United States."

**2. *Congress has authorized hostilities in Vietnam.***

█ Plaintiff does not assert that Congress must say "We declare war," but he argues that the Constitution requires a prior explicit authorization to use troops abroad in actions of the highest magnitude, and that there was no prior explicit authorization for the Vietnam hostilities. It is therefore necessary to review the various executive and legislative steps from 1964.

The Gulf of Tonkin Resolution (Pub. L. 88–408, 78 Stat. 384, Aug. 10, 1964) was passed within a week after the second alleged attack on United States naval vessels by North Vietnam. After reciting that the Communist regime in North Vietnam was engaged in a systematic campaign of aggression against its neighbors, whom the United States was assisting to protect their freedom, it set forth that:

> "the Congress approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States *and to prevent further aggression.*" (Emphasis added).

It is true that the President said in recommending action by Congress, that the United States "seeks no wider war" (110 Cong.Rec. 18132), but the Resolution gave him authority to prevent aggression against Southeast Asia peoples who were protecting their freedom. This court cannot say that the present conflict is "wider" than was authorized by the Joint Resolution and the subsequent acts of Congress. Plaintiff points out that the State Department said in 1970 in a letter to Senator Fulbright that "*this* administration has not relied on or referred to the Tonkin Gulf Resolution of August 10, 1964 as support for its Vietnam policy." He omits the next sentence of the same letter that "Repeal at this time, however, may well create the wrong impression abroad about U.S. policy." Sen.Rep. No. 91–872, May 15,

1970, p. 23. (Emphasis added). Moreover, this same State Department letter said of the Formosa, Mid-East, Cuba and Tonkin Gulf resolutions, that they were "a highly visible means of executive-legislative consultation * * * indicating congressional approval for the possible employment of U.S. military forces." Sen.Rep. No. 91–872, p. 20.

Five months after the Tonkin Gulf Resolution, the President told Congress in his 1965 State of the Union message that we were in Viet-Nam because a friendly nation asked for help against Communist aggression, and that our security was tied to the peace of Asia, continuing:

"Twice in one generation we have had to fight against aggression in the Far East. To ignore aggression now would only increase the danger of a much larger war." Public Papers of President Lyndon B. Johnson, 1965, Item 2, p. 3.

Although the Defense Department was operating under the 1964 appropriations bill, the President asked and obtained a special appropriation of $700,000,000 for "military activities in southeast Asia." Pub.L. 89–18, 79 Stat. 109, May 7, 1965. This was a single-item appropriation, which read:

"The following is appropriated, out of any money in the Treasury not otherwise appropriated, for the period ending June 30, 1965, namely:

"Department of Defense

Emergency Fund, Southeast Asia

"For transfer by the Secretary of Defense, upon determination by the President that such action is necessary in connection with military activities in southeast Asia, to any appropriation available to the Department of Defense for military functions, to be merged with and to be available for the same purposes and for the same time period as the appropriations to which transferred

$700,000,000, to remain available until expended: * * *."

The vote was 408 to 7 in the House (111 Cong.Rec. 9540) and 88 to 3 in the Senate (111 Cong.Rec. 9772).

This is the sort of single-purpose appropriations act concerning which it has been said:

"Although it may be admitted that an appropriations bill could be introduced under circumstances which leave room for no interpretation other than 'a vote for the bill is a vote for the war,' it is hard to see why, even in such cases, resort to implied rather than express authorization is necessary." Note, Congress, The President, and the Power to Commit Forces to Combat, 81 Harv.L.Rev. 1771, 1801 (1968).

The comment admits the purpose of the enactment, but merely suggests that Congress might use a different form of words for the same purpose.

Plaintiff quotes a Congressman who said that the President had sufficient funds without this appropriation, and that the bill was merely "an engineering of consent" to his military policies. He quotes others as saying that their votes for the appropriation did not constitute approval of an undeclared war. Whatever the comments of individual Congressmen, the act nevertheless gave Congressional approval to military expenditures in Southeast Asia. That some members of Congress talked like doves before voting with the hawks is an inadequate basis for a charge that the President was violating the Constitution in doing what Congress by its words had told him he might do.

Between December 31, 1964 and May, 1965, the number of United States troops in Vietnam had increased from 23,300 to 34,000 (all figures in this section are from Professor Raskin's affidavit unless otherwise stated). The numbers increased to 75,000 by July, 1965.

An additional $1,700,000,000 for "military activities in southeast Asia" was included in the Department of Defense Appropriation Act of 1966. Pub.L. 89–213, 79 Stat. 863, 872, Sept. 29, 1965. This was in Title V of the bill, a special

and unusual title. The first four titles were (I) Military Personnel, (II) Operation and Maintenance, (III) Procurement, and (IV) Research, Development, Testing and Evaluation. Title VI comprised General Provisions.

In contrast to the assertions of plaintiff's experts that statements of policy do not belong in appropriations bills, there were numerous statements of policy in the 1966 Defense Appropriations Act. In Title VI there were fifteen sections which began with a statement such as, "No appropriation contained in this act shall be available for * * *." Pub.L. 89–213, §§ 609, 610, 613, 614, 615, 617, 621, 622, 623, 624, 634, 635, 637, 638, 640.

By November 20, 1965, the number of U.S. troops in Vietnam had increased from 75,000 to 165,000.

In the opening portion of his State of the Union Message in January, 1966, the President stated that:

"Our Nation tonight is engaged in a brutal and bitter conflict in Viet-Nam. * * *

"This nation is mighty enough * * to pursue our goals in the rest of the world while still building a Great Society here at home.

* * * * * *

"Because of Viet-Nam we cannot do all that we should, or all that we would like to do." Weekly Compilation of Presidential Documents, Jan. 17, 1966, pp. 27, 28.

Later in the same message he stated that:

"Special Viet-Nam expenditures for the next fiscal year are expected to increase by $5.8 billion." *Ibid.*, p. 33.

The President referred to a temporary bombing cessation which was a bid for peace in Vietnam, but stated that the fighting force had been increased to 190,000 men, and that "we do not intend to abandon Asia to conquest." *Ibid.*, p. 35.

The Military Construction etc. Act of 1966 contained a specific authorization to use funds authorized for the armed forces under that act or any other act "for their stated purposes in connection with support of Vietnamese and other free world forces in Vietnam, and related costs, during the fiscal years 1966 and 1967." Pub.L. 89–367, § 401, 80 Stat. 36, 37, March 15, 1966. Seventy-eight members of the House of Representatives signed a statement in connection with this bill, disclaiming any support for "unrestrained or indiscriminate enlargement of the military effort." As quoted in Professor Raskin's affidavit, the statement concluded:

"We, in particular, wish to express our concurrence with the President's statement of last week in which he declared the Vietnamese conflict to be a limited war for limited objectives calling for the exercise of 'prudent firmness under careful control.'" 112 Cong.Rec. 4431.

By the end of 1966, there were 250,000 American military men in South Vietnam.

In his State of the Union message on January 10, 1967, the President told Congress that we were in Vietnam because of the SEATO Treaty, because of a 1962 agreement which the Communists were violating, and because the people of South Vietnam have a right to remain non-Communist, if they choose. He added:

"We are there because the Congress has pledged by solemn vote to take all necessary measures to prevent further aggression.

* * * * * *

"We have chosen to fight a limited war in Vietnam in an attempt to prevent a larger war * * *." Weekly Compilation of Presidential Documents, Jan. 16, 1967, p. 36.

In his Budget Message on January 24, 1967, the President again referred to the Vietnam conflict, and said:

"We have at the same time become engaged in a major effort to deter aggression in Southeast Asia. Some $19.9 billion of the nation's resources

will go to support that effort in the current fiscal year and $22.4 billion in 1968." Weekly Compilation of Presidential Documents, Jan. 30, 1967, p. 84. He referred to "the cost of honoring our commitment to South Vietnam" in a later portion of the message. *Ibid.*, p. 89.

In a letter to the Speaker on the same date, the President submitted a supplemental request for $12,275,890,000 "for the support of military operations in Southeast Asia to help finance an increase of $9.1 billion in fiscal 1967 expenditures over our earlier estimates." *Ibid.*, p. 97.

Congress responded with an authorization bill enacted on March 16, 1967 (Pub. L. 90–5, 81 Stat. 5) and a supplemental appropriation bill (Pub.L. 90–8, 81 Stat. 8) enacted on April 4, 1967. The 1967 Armed Forces Supplemental Authorization Act contained a "Statement of Congressional Policy" concerning Vietnam, introduced by Senator Mansfield as an amendment to the bill when it came from the House. Pub.L. 90–5, § 401. This statement reads in part:

"The Congress hereby declares—

"(1) its firm intentions to provide all necessary support for members of the Armed Forces of the United States fighting in Vietnam;

"(2) its support of efforts being made by the President of the United States and other men of good will throughout the world to prevent an expansion of the war in Vietnam and to bring that conflict to an end through negotiated settlement which will preserve the honor of the United States * * *."

The fact that the policy statement expresses a desire for a negotiated peace is not inconsistent with its being also authorization for a continued limited war. The object of war is seldom simply to fight; usually the object is to obtain peace on satisfactory terms. The amendment was approved in the Senate by a vote of 89 to 2 (113 Cong.Rec. 4942). It was not put to a vote in the House, because the acting Chairman of the House ruled that it was not germane. 113 Cong.Rec. 5141—Raskin affidavit, pp. 25–26. Nevertheless, the authorization bill was passed by the House by a vote of 364 to 13 after the Senate members of the Conference Committee insisted on retaining the Mansfield amendment. 113 Cong.Rec. 5772.

General William C. Westmoreland reported on Vietnam to a joint session of the House and Senate on April 28, 1967. Invited guests included the governors of the several States, the Ambassadors, Ministers, and charges d'affaires of foreign governments, the President, and the members of his Cabinet. The Speaker introduced General Westmoreland as "Commander, the U.S. Military Assistance Command, Vietnam." Cong.Rec., April 28, 1967, p. 11153. The General paid tribute to "the gallant American fighting men in Vietnam today," described the nature of the war being waged by the Vietnamese ("total war all day—every day," p. 11154), referred to five other free world allies who had military forces fighting with the Vietnamese and Americans, reported that thirty other nations were providing noncombat support, and said:

"Your continued strong support is vital to the success of our mission." *Ibid.*, p. 11155.

During 1967, three other enactments by the Congress evidenced its continued support of the Vietnam action. The Military Selective Service Law of 1967 was enacted to replace the prior draft law, which was about to expire. Pub.L. 90–40, 81 Stat. 100, June 30, 1967. The Department of Defense Appropriations Act for 1968 was passed, with a specific provision that "Appropriations available to the Department of Defense during the current fiscal year shall be available for their stated purposes to support: (1) Vietnamese and other free world forces in Vietnam, (2) local forces in Laos and Thailand; and for related costs, * *." Pub.L. 90–96, 81 Stat. 231, 248, Sept. 29, 1967, § 639(a). Moreover, as noted by Judge Dooling, Congress amended the definition of "period of war" for pur-

poses of veterans' benefits to include "the Vietnam era." 38 U.S.C. § 101(11), added August 31, 1967. The argument that this last action was merely an act of justice to veterans is not persuasive; in the context of all the prior legislative history, it is clear recognition by Congress that a state of war existed.

By the end of 1967, there were 475,000 American military men in Vietnam, and the military command regarded this number as insufficient.

Plaintiff asserts that the President was always ahead of Congress in sending troops, and that Congress was always presented with a *fait accompli* which it was compelled to ratify. The course of events described above is more consistent with Congress and the President moving in concert.

Congressional support continued after 1967. Subsequent authorization and appropriations bills specifically mentioned Vietnam. Pub.L. 90–110, § 501, 81 Stat. 279, 301, Oct. 21, 1967; Pub.L. 90–392, 82 Stat. 307, 311, July 9, 1968; Pub.L. 90–500, § 401, 82 Stat. 849, 850–851, Sept. 20, 1968; Pub.L. 90–580, § 537, 82 Stat. 1120, 1136, Oct. 17, 1968; Pub.L. 91–121, §§ 101, 401, 83 Stat. 204, Nov. 19, 1969; Pub.L. 91–171, § 638, 83 Stat. 469, Dec. 29, 1969. The State of the Union Messages and budget messages continued to describe the status of the war in Vietnam. Jan. 17, 1968, in Jan. 22, 1968 Weekly Compilation of Presidential Documents, pp. 70–71; Jan. 29, 1968, in Feb. 5, 1968 Weekly Compilation, etc., p. 156; Jan. 14, 1969, in Feb. 5, 1969 U.S.Code Congr. and Admin.News, p. 12; Jan. 15, 1970, *ibid.*, pp. 14, 25; Jan. 22, 1970, in Feb. 20, 1970 U.S.Code Congr. and Admin.News, pp. 7–8; Feb. 2, 1970, *ibid.*, pp. 15, 27.

Authorized expenditures for Vietnam increased from $21.9 billion in 1967 to $25.8 billion in 1968 and $28.8 billion in 1969, declining to $25.4 billion in 1970.

In 1969, Congress added a policy statement to the Defense Appropriations Act, 1970, which was very different from the 1967 Mansfield amendment. The new statement was:

"Sec. 643. In line with the expressed intention of the President of the United States, none of the funds appropriated by this Act shall be used to finance the introduction of American ground combat troops into Laos or Thailand." Pub.L. 91–171, 83 Stat. 469.

Since the submission of this case, copies have become available of an amendment made by Congress to the War Claims Act of 1948, revising the definition of "prisoner of war" to include members of the U.S. Armed Forces held as prisoner of war "during the Vietnam conflict by any force hostile to the United States." Pub.L. 91–289, 84 Stat. 323, June 24, 1970, amending 50 U.S.C.App. § 2005. By the same act, provision was made for compensation to any civilian American citizen captured by hostile forces during "the Vietnam conflict." Pub.L. 91–289, *supra*, § 3. As with respect to the statute including "the Vietnam era" within the definition of "period of war" for purposes of veterans' benefits, the 1970 amendments may have been motivated in part by humanitarian compassion for those captured by hostile forces. Nevertheless, the statutes may appropriately be regarded as express recognition by Congress that the United States is engaged in a state of partial war in Vietnam.

### *Congress May Speak Through Appropriations Acts*

██ The Supreme Court has held that powers can be conferred on the President by appropriations acts. The creation of a new agency by Executive Order was held to have been ratified when Congress appropriated funds for the agency. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947), stating:

"And the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification

of the action of the Chief Executive." 331 U.S. at 116, 67 S.Ct. at 1132.

See also Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399 (1941). There was a dictum to the same effect in Ex parte Endo, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 219, 89 L.Ed. 243 (1944), so long as the appropriations "plainly show a purpose to bestow the precise authority which is claimed."

Of course, there are instances where appropriations do not confer authority or ratify action—as where there is an appropriation to support an agency, without proof that Congress knew what the agency was doing. Greene v. Mc-Elroy, 360 U.S. 474, 506, 79 S.Ct. 1400, 1418, 3 L.Ed.2d 1377 (1959). The court there held that an appropriation to the Department of Defense for its security program did not constitute ratification of a procedure which denied the right of an individual to confront the witnesses against him. The conflict in Vietnam was not something hidden in department regulations; it was a matter of wide discussion in the press and in Congress before the appropriations were made.

An appropriations act is like any other act of Congress. It must be introduced by a member of Congress, and obtain a majority vote in both House and Senate. The Constitution is not concerned with boundaries between the jurisdiction of appropriations sub-committees and substantive committees. Rules limiting amendment, even if enforced, are not of constitutional significance. In fact, appropriations are entitled to special weight because the Congress customarily acts twice, once to authorize the expenditure and again to appropriate money.

■ While this court ruled above that Congress had met plaintiff's standard of *prior* authorization for high-level military activity, the usual rule permits ratification of any act that could have been authorized. A.L.I., Restatement of Agency, 2d (1958)—§§ 84, 92.

Plaintiff contends that any authorizations for Vietnam hostilities are not sufficiently explicit. This argument puts too narrow a limit on Congress' manner of expressing its will. The entire course of legislation shows that Congress knew what it was doing, and that it intended to have American troops fight in Vietnam.

■ The disclaimers by individual Congressmen of any approval of the Vietnam conflict were dealt with by Judge Dooling, who said:

"Such evidence * * * could only disclose the motive and could not disprove the fact of authorization." Orlando v. Laird, 317 F.Supp., p. 1019.

3. *How Congress should express itself is a Political Question.*

■ Having found that Congress authorized the sending of American troops to Vietnam, the court would be entering the realm of politics in saying that the authorization should have been couched in different language.

In connection with the French Naval War, it was noted above that the Supreme Court referred to political sentiment in the United States as not supporting a declaration of war against France, but still held that Congress had created a state of limited war. The Eliza, *supra,* 4 U.S. 37.

In connection with the Vietnam conflict, Congress may also have had reasons for acting in a manner short of an express declaration of war. A declaration of war might have consequences far beyond North Vietnam, and might trigger unknown responses from Communist China and the Soviet Union. Congress may also have considered the well known fact that many of our friends in the free world look askance at our Vietnam adventure. To change the professed character of the conflict from a defense of South Vietnam against aggression to a declared war against North Vietnam might affect our relations with friendly powers abroad, and with non-aligned nations.

Respect for the Congressional judgment is also supported by the opinion of the Court of Appeals for the District

of Columbia, which dismissed a suit to declare the Vietnam military action unconstitutional with the statement that:

"It would be difficult to think of an area less suited for judicial action." Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664, 665 (1967), cert. den. 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed. 2d 1332 (1967).

A similar conclusion was reached by Judge Wyzanski on a preliminary motion in United States v. Sisson, 294 F.Supp. 511 (D.Mass.1968). After finding that there was joint action by the President and Congress, without a declaration of war, he ruled that the method of collaboration between Congress and the Executive is a political question, saying (p. 515):

"* * * the distinction between a declaration of war and a cooperative action by the legislative and executive with respect to military activities in foreign countries is the very essence of what is meant by a political question. It involves just the sort of evidence, policy considerations, and constitutional principles which elude the normal processes of the judiciary and which are for more suitable for determination by coordinate branches of the government."

See also Simmons v. United States, 406 F.2d 456, 464 (5th Cir. 1969), cert. den. 395 U.S. 982, 89 S.Ct. 2144, 23 L.Ed.2d 770 (1969).

This is not a case where the President relied on his own power without any supporting action from Congress, as in the steel seizure. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In that case it was conceded that there was no Congressional authorization for the seizure. 343 U.S. at 638, 72 S.Ct. at 871. The President had reported his action to Congress, and Congress took no action. 343 U.S. at 583, 72 S.Ct. at 865.

The present case presents at least one of the elements which the Supreme Court has held to involve a political question. The combination of Congress' power to declare war and the President's power to direct the armed forces as Commander-in-Chief provide a "textually demonstrable constitutional commitment of the issue to a coordinate political department" other than the judiciary. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Another element of the Baker v. Carr tests of political questions is the avoidance of any expression of "lack of the respect due coordinate branches of government." 369 U.S. at 217, 82 S.Ct. at 710. Under this test, the court should respect the authorization which Congress has given to the President.

That Congress may use a variety of methods in authorizing military activities is illustrated by the Supreme Court's statement in The Prize Cases, 67 U.S. (2 Black) 635, 670, 17 L.Ed. 459 (1862) that

"If it were necessary to the technical existence of a war, that it should have a legislative sanction, we find it in almost every act passed at the extraordinary session of the Legislature in 1861, which was wholly employed in enacting laws to enable the Government to prosecute the war with vigor and efficiency."

Nothing which plaintiff has offered in this case requires a departure from Judge Dooling's conclusion (317 F.Supp. 1019) that

"Political expediency may have counseled the Congress's choice of the particular forms and modes by which it has united with the presidency in prosecuting the Vietnam combat activities, but the reality of the collaborative action of the executive and the legislative required by the Constitution has been present from the earliest stages."

4. *Summary Judgment as an Appropriate Remedy.*

Plaintiff filed a "Statement of Material Facts as to which there is genuine

Issue" pursuant to Rule 9(g) of the General Rules of this court. Six issues are asserted to exist. Three of these are legal inferences which plaintiff says should be drawn from the claimed facts.

The first assertion is that "episodes of significant conflict" prior to 1950 were authorized by "explicit Congressional action." This assertion is not disputed, but is accepted as true by defendants. The assertion raises only a legal issue as to whether Congress' authorization of Vietnam hostilities was "explicit." It is true that the Court of Appeals described Congress as having acted "*impliedly* through appropriations and other acts." (429 F.2d, p. 305 emphasis added). A more detailed analysis of the various Congressional acts has now been made than was available to the Court of Appeals when it spoke. The nature of Congress' expression of authority in prior conflicts has also been set forth for comparison. As a matter of law, the Congressional authorization here is sufficiently "explicit" to satisfy constitutional requirements.

Plaintiff's second assertion is that the level and nature of our military action in Vietnam has increased since 1950. This fact also is not disputed by defendants.

The final issue posed by plaintiff is that appropriations bills cannot constitute explicit approval for hostilities. This is disputed, but it would be wrong to treat this as an assertion of fact. Supporting documentation has been provided by plaintiff, and the court has determined that oral testimony or further exhibits would not change the conclusions of law reached above.

It is true that the Court of Appeals mentioned the need for the facts relevant to the basic legal issues (429 F.2d, p. 306), but these facts are basically documentary and historical, and almost entirely within the realm of judicial notice.

None of plaintiff's cases make summary judgment an inappropriate remedy in this case. Kletschka v. Davies, 411 F.2d 436 (2d Cir. 1969), for instance, involved a substantial dispute concerning the extent to which defendants were responsible for what plaintiff considered punitive action against him.

The Court of Appeals has encouraged the use of summary judgment when there are no factual issues to be tried. Dressler v. M. V. Sandpiper, 331 F.2d 130 (2 Cir., 1964); Waldron v. Cities Service Co., 361 F.2d 671 (2 Cir., 1966).

The legislative materials relied on by defendants are just as factual as the affidavits submitted by plaintiff. Evidence within the realm of public documents and judicial notice is of equal value with sworn testimony in deciding issues to which it is relevant.

### Other Issues

Plaintiff's reliance on Section 5 of the New York Civil Rights Law, McKinney's Consol.Laws, c. 6, gives him no support in resisting a constitutionally valid order to report for duty in the armed forces of the United States. The section, set forth in full in the Court of Appeals opinion (429 F.2d, p. 304, n. 1), expressly recognizes that any restrictions on the military service of New York citizens must be subject to the Supremacy Clause of the United States Constitution. Art. VI.

This court will not deal with the question whether South Vietnam or the United States violated the provisions of the Geneva Agreements concerning general elections in Vietnam. That question does not affect the authority given to the President by Congress.

Interpretation of the SEATO Treaty or other international agreements cited by the parties is also unnecessary to the decision of the question of United States "municipal law," whether Congress has authorized American troops to fight in Vietnam.

### Conclusion

The Congress repeatedly and unmistakably authorized the use of armed forces of the United States to fight in Vietnam. Whether this was a prudent course of action or a tragic diversion of

men and money, is immaterial. The Vietnam conflict cannot be blamed on usurpation by either of the Presidents who have held office from 1964 to date. Having reached that decision, the court's function is ended.

It is ORDERED that defendants' motion for summary judgment be granted, and that the Clerk enter judgment dismissing the complaint without costs.