Elizabeth **HOLTZMAN**, Individually and in her capacity as a member of the United States House of Representatives, et al., Plaintiffs,

v.

James R. **SCHLESINGER**, Individually and as Secretary of Defense, et al., Defendants.

No. 73–C–537.

United States District Court,
E. D. New York.

July 25, 1973.

Neuborne & Friedman, New York City by Burt Neuborne, Leon Friedman, New York City, of counsel, for plaintiffs.

Robert A. Morse, U. S. Atty., E. D. N. Y., by James D. Porter, Jr., Brooklyn, N. Y., Cyril Hyman, Asst. U. S. Attys., New York City, of counsel, for defendants.

Earle K. Moore, New York City, for Council for Christian Social Action of the United Church of Christ, and others, amici curiae.

Rabinowitz, Boudin & Standard, New York City, for Congressman Parren J. Mitchell and others, amici curiae by Michael Krinsky and Eric Lieberman, New York City, of counsel.

## MEMORANDUM AND ORDER

JUDD, District Judge.

Plaintiffs seek a determination that the President of the United States and the military personnel under his direction and control may not engage in intensive combat operations in Cambodia and elsewhere in Indochina in the absence of Congressional authorization required under Article I, § 8, Clause 11 of the Constitution. The case is before the court on plaintiffs' motion for summary judgment for lack of genuine issues of material fact. Additionally, plaintiffs seek declaratory and/or injunctive relief.

Plaintiffs have also moved to add as plaintiff another Air Force officer on active duty, Captain Donald Dawson, and to stay the defendants from ordering him to engage in bombing missions over Cambodia.

### Posture of the Case

At an earlier stage this court denied defendants' motion to dismiss the complaint, and overruled the contentions that Congresswoman Holtzman lacked standing to challenge the military activities in question and that the controversy presented a nonjusticiable political question.

Both sides were given an opportunity to submit any additional papers that would bear on the appropriateness of summary judgment.

### Facts

Review of the facts may begin with 1970, since the earlier phases of hostili-

ties in Indochina have been summarized in an earlier case.

This court held in September 1970 in Berk v. Laird, 317 F.Supp. 715 (E.D.N. Y.1970), aff'd sub nom., Orlando v. Laird, 443 F.2d 1039 (2d Cir. 1971), that Congress had authorized hostilities in Vietnam to that date through a series of appropriation acts.

### Hostilities in Cambodia

In response to Presidential pronouncements concerning the necessity of military action in Cambodia, there was a series of Congressional responses seeking in the main to limit such military action, and culminating in two laws enacted on July 1, 1973 which directed that no funds might be expended for Cambodian combat activities after August 15, 1973.

On April 30, 1970, the President stated in an address to the nation that "North Vietnam has occupied military sanctuaries all along the Cambodian frontier with South Vietnam," that Cambodia had therefore called on the United States for assistance, and that attacks were therefore being launched "to clean out major enemy sanctuaries on the Cambodian-Vietnam border." The Situation in Southeast Asia, 6 Presidential Documents 596, 597, 598.

On June 30, 1970, a report by the President on the Cambodian operation, released at San Clemente, California, stated that all American troops had withdrawn from Cambodia, but that the United States would continue to conduct air interdiction missions to prevent supplies and personnel being moved through Cambodia toward South Vietnam, and that "We do this to protect our forces in South Vietnam." The President also stated that one of the reasons for attacking the enemy's "sanctuaries" in Cambodia was that this would "enhance the prospects of a negotiated peace." The Cambodian Operation, 6 Presidential Documents 843, 850, 852.

The so-called Fulbright proviso, limiting military support to Cambodia except to the extent necessary to insure the safe withdrawal of United States forces from Southeast Asia and the release of American prisoners of war, was adopted by the Congress during the summer of 1970 and inserted in the War Forces-Military Procurement Act of 1971 and became law with the President's approval on October 7, 1970. This proviso, which was repeated in every subsequent military appropriation and authorization act, reads as follows:

. . . nothing [herein] shall be construed as authorizing the use of any such funds to support Vietnamese or other free world forces in actions designed to provide military support and assistance to the Government of Cambodia or Laos: *Provided further,* That nothing contained in this section shall be construed to prohibit support of actions required to insure the safe and orderly withdrawal or disengagement of U.S. Forces from Southeast Asia, or to aid in the release of Americans held as prisoners of war.

P.L. 91–441, 84 Stat. 905; P.L. 91–668, 84 Stat. 2020; P.L. 92–156, 85 Stat. 423; P.L. 92–204, 85 Stat. 716; P.L. 92–436, 86 Stat. 734; P.L. 92–570, 86 Stat. 1184.

On the evening of the same day the Fulbright proviso became law, October 7, 1970, the President addressed the nation by radio and television and stated that the North Vietnamese were carrying on aggression in Laos and Cambodia as well as in Vietnam and that "The war in Indochina has been proved to be of one piece; it cannot be cured by treating only one of its areas of outbreak." The New Initiative for Peace in Southeast Asia, 6 Presidential Documents 1349, 1350.

The Special Foreign Assistance Act of 1971 (P.L. 91–652, 84 Stat. 1942), approved January 1, 1971, provided:

Sec. 7. (a) In line with the expressed intention of the President of the United States, none of the funds authorized or appropriated pursuant to this or any other Act may be used

to finance the introduction of United States ground combat troops into Cambodia, or to provide United States advisers to or for Cambodian military forces in Cambodia.

(b) Military and economic assistance provided by the United States to Cambodia and authorized or appropriated pursuant to this or any other Act shall not be construed as a commitment by the United States to Cambodia for its defense.

On February 25, 1971, the President submitted a foreign policy report to Congress, saying again that the war in Indochina was "of one piece," that because of North Vietnamese infiltration in Cambodia "We faced the prospect of one large enemy base camp 600 miles along South Vietnam's flank;" and that our policy for Cambodia included "air missions against enemy supplies and personnel that pose a potential threat to South Vietnam or seek to establish base areas relevant to Vietnam." United States Foreign Policy for the 1970's: Building for Peace, 7 Presidential Documents 305, 328, 332.

On November 17, 1971, the so-called Mansfield amendment became law by action of Congress with the President's approval, and expressed the United States policy "to terminate at the earliest practicable date all military operations of the United States in Indochina." The pertinent portions of this amendment, which was part of the Appropriations Authorizations-Military Procurement Act, 1972, state:

Sec. 601. (a) It is hereby declared to be the policy of the United States to terminate at the earliest practicable date all military operations of the United States in Indochina, and to provide for the prompt and orderly withdrawal of all United States military forces at a date certain, subject to the release of all American prisoners of war held by the Government of North Vietnam and forces allied with such Government and an accounting for all Americans missing in action who have been held by or known to

such Government or such forces. The Congress hereby urges and requests the President to implement the above-expressed policy by initiating immediately the following actions:

(1) Establishing a final date for the withdrawal from Indochina of all military forces of the United States contingent upon the release of all American prisoners of war held by the Government of North Vietnam and forces allied with such Government and an accounting for all Americans missing in action who have been held by or known to such Government or such forces.

(2) Negotiate with the Government of North Vietnam for an immediate cease-fire by all parties to the hostilities in Indochina.

(3) Negotiate with the Government of North Vietnam for an agreement which would provide for a series of phased and rapid withdrawals of United States military forces from Indochina in exchange for a corresponding series of phased releases of American prisoners of war, and for the release of any remaining American prisoners of war concurrently with the withdrawal of all remaining military forces of the United States by not later than the date established by the President pursuant to paragraph (1) hereof or by such earlier date as may be agreed upon by the negotiating parties.

In the Defense Appropriation Act of 1972 (P.L. 92-204), approved December 18, 1971, Congress specified:

Sec. 738(a) Not to exceed $2,500,000,-000 of the appropriations available to the Department of Defense during the current fiscal year shall be available for their stated purposes to support; (1) Vietnamese and other free world forces in support of Vietnamese forces (2) local forces in Laos and Thailand; and for related costs, on such terms and conditions as the Secretary of Defense may determine: . . . Provided further, that nothing in

clause (1) of the first sentence of this subsection shall be construed as authorizing the use of any such funds to support Vietnamese or other free world forces in actions designed to provide military support and assistance to the Government of Cambodia or Laos: Provided further that nothing contained in this section shall be construed to prohibit support of actions required to insure the safe and orderly withdrawal or disengagement of U.S. Forces from Southeast Asia, or to aid in the release of Americans held as prisoners of war.

This language was continued in all subsequent military authorization or appropriations acts. See Appropriations Authorization-Military Procurement Act, 1972, P.L. 92–156, 85 Stat. 423, November 17, 1971, Sec. 501; Military Procurement Act, 1973, P.L. 92–436, 86 Stat. 734, September 26, 1972, Sec. 601; Department of Defense Appropriation Act, 1973, P.L. 92–570, 86 Stat. 1184, October 26, 1972, Sec. 737.

In the Foreign Assistance Act, 1971, approved on February 7, 1972, the Congress expressly stated that limited foreign aid to Cambodia "shall not be construed as a commitment by the United States to Cambodia for its defense." P.L. 92–226, 22 U.S.C. § 2415(g). The Act recognized the existence of bombing in Cambodia, in language which both sides cite. The pertinent provisions of the Act read as follows:

Sec. 655. Limitations Upon Assistance to or for Cambodia.—(a) Notwithstanding any other provision of law, no funds authorized to be appropriated by this or any other law may be obligated in any amount in excess of $341,000,000 for the purpose of carrying out directly or indirectly any economic or military assistance, or any operation, project, or program of any kind, or for providing any goods, supplies, materials, equipment, services, personnel, or advisers in, to, for, or on behalf of Cambodia during the fiscal year ending June 30, 1972.

(c) No funds may be obligated for any of the purposes described in subsection (a) of this section in, to, for, or on behalf of Cambodia in any fiscal year beginning after June 30, 1972, unless such funds have been specifically authorized by law enacted after the date of enactment of this section. In no case shall funds in any amount in excess of the amount specifically authorized by law for any fiscal year be obligated for any such purpose during such fiscal year.

(d) The provisions of subsections (a) and (c) of this section shall not apply with respect to the obligation of funds to carry out combat air operations over Cambodia.

(e) After the date of enactment of this section, whenever any request is made to the Congress for the appropriation of funds for use in, for, or on behalf of Cambodia for any fiscal year, the President shall furnish a written report to the Congress explaining the purpose for which such funds are to be used in such fiscal year.

Sec. 656. Limitations on United States Personnel and Personnel Assisted by United States in Cambodia. —The total number of civilian officers and employees of executive agencies of the United States Government who are citizens of the United States and of members of the Armed Forces of the United States (*excluding such members while actually engaged in air operations in or over Cambodia which originate outside Cambodia*) present in Cambodia at any one time shall not exceed two hundred. The United States shall not, at any time, pay in whole or in part, directly or indirectly, the compensation or allowances of more than eighty-five individuals in Cambodia who are citizens of countries other than Cambodia or the United States. For purposes of this section, "executive agency of the Unit-

ed States Government" means any agency, department, board, wholly or partly owned corporation, instrumentality, commission, or establishment within the executive branch of the United States Government. (Emphasis added).

On February 9, 1972, the President stated to Congress that North Vietnam continued to threaten the legitimate governments in Laos and Cambodia "in order to further its attacks on South Vietnam," and stated that "In Cambodia, operations are at the request of the Government and serve to relieve enemy pressures against Cambodia as well as South Vietnam." United States Foreign Policy for the 1970's: The Emerging Structure of Peace, 8 Presidential Documents 235, 343–45.

On April 18, 1972, testimony before the House of Representatives Committee on Armed Services stated that a significant portion of the Navy and Air Force incremental war costs of $2,023,000,000 for fiscal 1972 "could be attributed to operations in Laos and Cambodia." Cong.Rec. 9173. Some information presented at that time was classified and made available for inspection only by members of Congress.

### Events in 1973

On January 27, 1973, the parties participating in the Paris Conference on Vietnam signed an Agreement on Ending the War and Restoring Peace in Vietnam, which stated in Article 20(a):

. . . The parties participating in the Paris Conference on Vietnam undertake to refrain from using the territory of Cambodia and the territory of Laos to encroach on the sovereignty and security of one another and of other countries.

The affidavit of the Assistant United States Attorney opposing the motion for summary judgment asserts that after January 27, 1973, despite a unilateral cessation of hostilities by the governments of Cambodia and the United States, "the North Vietnamese launched a general offensive in Cambodia, continuing the combat there. The military response of the United States continued."

In fact, there is evidence that air operations over Cambodia since January 27, 1973 have escalated sharply. A report on United States Air Operations in Cambodia prepared for the Subcommittee on United States Security Agreements and Commitments Abroad (April 1973—G.P.O.), states on page 7 that in the period February 16 through February 28, 1973, an average of twenty-three tactical air sorties a day and five B-52 sorties were flown in Cambodia. In the following two-week period, March 1– March 15, an average of fifty-eight tactical and gunship sorties and twenty B-52 sorties were flown. Between March 16–March 31, an average of 184 tactical sorties and fifty-eight B-52 sorties were flown. A statistical summary submitted by the Department of Defense to the Senate Armed Services Committee on June 19, 1973 shows that in the period October 30, 1972–January 27, 1973, 936 combat sorties were flown over Cambodia and that in the period January 27, 1973–April 30, 1973, 12,136 sorties were flown.

The last American combat troops were withdrawn from South Vietnam on March 28, 1973 and the last known American prisoners of war were released on April 1, 1973.

Secretary of State Rogers on April 3, 1973, submitted a statement on "Presidential Authority to Continue U.S. Air Combat Operations in Cambodia" to the Senate Committee on Foreign Relations at hearings concerning the Department of State Appropriations Authorization for fiscal 1974. The statement asserted its view that

the conflicts in Laos and Cambodia are closely related to the conflict in Vietnam and, in fact, are so inter-related as to be considered parts of a single conflict.

Hearings on S. 1248 and H.R. 5610, 93d Cong. 1st Sess. p. 452. It was further

stated that the presence of North Vietnamese troops in Laos and Cambodia threatened the right of self-determination of the South Vietnamese people, which was guaranteed by the Paris Agreement, and that air strikes in Cambodia were not for the defense of Cambodia as such, but to enforce compliance with the Vietnam (cease-fire) Agreement. *Id.* 453.

### Congressional Moves After the Repatriation of American Prisoners of War

The Defense Department sought authority in May 1973 to transfer $500 million to cover existing shortages of men and material. About $175 million was earmarked for Cambodian bombing operations. See 119 Cong.Rec. H 3449 (daily ed. May 8, 1973). On May 10, 1973, the House voted down the transfer authority by a vote of 219–188. 119 Cong.Rec. H 3561, 3592–93 (daily ed. May 10, 1973).

Immediately thereafter the House adopted the Long Amendment to the Second Supplemental Appropriations Bill H.R. 7447, which explicitly forbade the use of Defense Department funds for the Cambodian bombing. The amendment read:

> None of the funds herein appropriated to the Department of Defense under this Act shall be expended to support directly or indirectly combat activities in, over, or from off the shores of Cambodia by United States Forces.

119 Cong.Rec. H 3593 (daily ed. May 10, 1973). The Long Amendment passed by a vote of 224–172. *Ibid.* at H 3598.

Thereafter the Senate adopted a broader amendment to H.R. 7447, barring the use of any and all funds theretofore appropriated for the Defense Department for the bombing of Cambodia. It was introduced by Senator Eagleton on May 29, 1973:

> Sec. 305. None of the funds herein appropriated under this Act or heretofore appropriated under any other Act may be expended to support directly or indirectly combat activities in, over

or from off the shores of Cambodia, or in or over Laos by United States forces.

119 Cong.Rec. S 9827 (daily ed. May 29, 1973). The Eagleton amendment was adopted by a vote of 63–19 on May 31, 1973. 119 Cong.Rec. S 10128 (daily ed. May 31, 1973).

Since the Eagleton amendment was more inclusive than the Long amendment, the measure went to a conference committee of the two houses. On June 25, 1973, the House receded and accepted the broader Eagleton amendment by a vote of 235 to 172. 119 Cong.Rec. H 5268 (daily ed. June 25, 1973). The House refused to adopt a proposed amendment to delay the effect of the Eagleton amendment. The vote was 204 to 204. *Ibid.* H 5274.

Thereafter on June 26, 1973, the Senate agreed to the conference report on H.R. 7447 containing the Eagleton amendment. The vote was 81 to 11. 119 Cong.Rec. S 12057 (daily ed. June 26, 1973). The bill was then sent to the President.

The President vetoed H.R. 7447 on June 27, 1973. The House voted 241 to 173 to override the veto—a majority of sixty-eight votes but short of the required two-thirds vote. 119 Cong.Rec. H 5487 (daily ed. June 27, 1973).

On the same day, the Senate voted to attach the Eagleton amendment to H.R. 8410, a bill to continue the existing increase in public debt through November 30, 1973. The amendment read as follows:

> Sec. 501. No funds heretofore or hereafter appropriated under any Act of Congress may be obligated or expended to support directly or indirectly combat activities in, over, or from off the shores of Cambodia or in or over Laos by United States forces.

119 Cong.Rec. S 12171 (daily ed. June 27, 1973). The amendment was adopted by a vote of 67 to 29. *Ibid.* at S 12173. Thereafter the debt limit bill with the Eagleton amendment was passed by a vote of 72 to 19. *Ibid.* at S 12220.

On June 26, 1973 the House also adopted two amendments to the Continuing Appropriations Resolution (H.J.Res. 636), barring funds for Cambodian bombing. Congressman Long introduced the following amendment:

None of the funds under this joint resolution heretofore appropriated may be expended to support directly or indirectly combat activities in or over Cambodia or Laos or off the shores of Cambodia or Laos by United States forces.

Cong.Rec. H 5363 (daily ed. June 26, 1973). It passed by a vote of 218 to 194. *Ibid.* at H 5371. Congressman Addabbo introduced a similar amendment.

Sec. 108. None of the funds under this Joint Resolution may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, Vietnam and South Vietnam or off the shores of Cambodia, Laos, North Vietnam and South Vietnam by United States forces without the express consent of Congress.

It passed by a vote of 240 to 172. *Ibid.* at H 5373.

Faced with the dilemma of the President set upon vetoing any bill containing riders cutting off funds for Cambodian military operations and the urgency of providing funds for the operation of the federal government, Senator Fulbright on June 29, 1973, after conferences with White House representatives, introduced the following amendment to the Continuing Appropriations Resolution (H.J. Res. 636):

Sec. 109. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein, heretofore or hereafter appropriated may be obligated or expended to finance the involvement of United States military forces in hostilities in or over or from off the shores of North Vietnam, South Vietnam, Laos, or Cambodia.

119 Cong.Rec. S 12560 (daily ed. June 29, 1973). The Senate voted to adopt the Fulbright amendment 64 to 26. *Ibid.* S 12580. The Senate then voted to delete the earlier Eagleton amendment from the Continuing Appropriations Resolution. *Ibid.* S 12581.

The House refused to pass S 109 as worded and in conference S 108 was adopted. 119 Cong.Rec.No. 104 (daily ed. June 30, 1973). The Conference Report was approved by the House on June 30. *Ibid.* at H 5781. H.J.Res. 636, the Joint Resolution Continuing Appropriations for Fiscal 1974, Public Law 93–52, was signed into law by the President on July 1 and provided:

Sec. 108. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.

On July 1, the President also signed into law H.R. 9055, the Second Supplemental Appropriations Act, 1973, Public Law 93–50. The Act includes the following provision:

Sec. 307. None of the funds herein appropriated under this Act may be expended to support directly or indirectly combat activities in or over Cambodia, Laos, North Vietnam and South Vietnam by United States forces, *and after August 15, 1973, no other funds heretofore appropriated, under any other Act may be expended for such purpose.* (Emphasis added).

### Other Facts

The defendants do not disagree with plaintiffs' contention that all ground combat troops were withdrawn from Indochina on March 28, 1973. There is reference in the papers to a few members of the armed forces stationed as guards to the Embassy in Saigon, but no assertion that they are there to continue the Vietnam war.

The complete repatriation of all known American prisoners of war is established by testimony before Congress

quoted in plaintiffs' papers. Frank A. Sieverts, Special Assistant to the Deputy Secretary of State for Prisoner of War/Missing in Action Matters, in testimony before the National Security Policy and Scientific Developments Subcommittee of the House Committee on Foreign Affairs, May 31, 1973, stated:

It should be noted that there is no indication from these debriefings [of returning POW's] that any American personnel continue to be held in Indochina. All American prisoners known to any of our returned POW's have either been released or been listed by the communist authorities as having died in captivity. Returnees with whom I have talked, including those who appeared before this Subcommittee May 23, are clear in their belief that no U.S. prisoners continue to be held.

Defendants assert that the complete repatriation of prisoners of war is not an undisputed fact, but they have presented no evidence that there are any such prisoners remaining in North Vietnam or anywhere in Indochina. There remain, however, over 1,250 members of the armed forces listed as missing in action, who have not been located or officially declared to have died.

Plaintiffs and the *amici* assert that continuing hostilities in Cambodia do not represent activities of North Vietnamese troops, but a civil war between Khmer insurgents and the official government of Cambodia.

Plaintiffs and the *amici* also assert that continued U.S. bombing in Cambodia is causing the death and maiming of many civilians.

Defendants stated on oral argument that if summary judgment is denied, they would propose to offer testimony from Secretary of State Rogers, Secretary of Defense Schlesinger, and Dr. Kissinger concerning the necessity for the air operations and the importance of continuing bombing in Cambodia because of continuing confidential negotiations for a Cambodian cease-fire. No other offer of proof has been made on behalf of the defendants.

On July 23, 1973, the government informed the court that statistical data reflecting bombing activities in Cambodia between March 1969 and April 1970 had been "declassified" and were published in revised Table concerning fighter-bomber munitions and B-52 munitions in the Congressional Record for July 18, 1973. Defendants do not contend, however, that these facts were known to Congress before July 1, 1973. The court does not find that these facts are relevant to the issues dealt with herein.

### Discussion

#### 1. Legal Standards

The Court of Appeals of this circuit has spoken several times concerning earlier aspects of the Vietnam hostilities.

The teaching of DaCosta v. Laird, 471 F.2d 1146 (2d Cir. 1973), Orlando v. Laird, 443 F.2d 1039 (2d Cir. 1971), and Berk v. Laird, 429 F.2d 302 (2d Cir. 1970), is that the question of the balance of constitutional authority to declare war, as between the executive and legislative branches, is not a political question and hence presents a justiciable issue, if plaintiffs can succeed in showing that there are manageable standards to resolve the controversy.

The Court of Appeals in Berk v. Laird, *supra,* 429 F.2d at 305, stated that there might be manageable standards to determine whether "prolonged foreign military activities without any significant congressional authorization" might violate

a discoverable standard calling for *some* mutual participation by Congress in accordance with Article I, section 8. (Emphasis from the original).

This court on remand found that Congress in appropriations bills from 1965 through 1969 had shown "its continued support of the Vietnam action" and that Congress' choice of appropriations bills rather than a formal declaration of war to effectuate its intent involved a politi-

cal question which did not prevent the finding that the fighting in Vietnam was authorized by Congress and that such fighting was not a usurpation of power by either of the Presidents who had been in office after 1964. Berk v. Laird, *supra*, 317 F.Supp. at 726, 728–731.

 Nevertheless, appropriations bills do not necessarily indicate an open-ended approval of all military operations which may be conducted. See Mitchell v. Laird, 476 F.2d 533, 538 (D. C. Cir. 1973); Note, Congress, The President and the Power to Commit Forces to Combat, 81 Harv.L.Rev. 1171, 1802 (1968).

In affirming this court's *Berk* decision and Judge Dooling's similar *Orlando* decision, the Court of Appeals stated the test of whether there were manageable standards for adjudication as being "whether there is any action by the Congress sufficient to authorize or ratify the military activity in question." Orlando v. Laird, *supra*, 443 F.2d at 1042. It found that there was evidence of "an abundance of *continuing* mutual participation in the prosecution of the war." 443 F.2d at 1042. (Emphasis added).

More recently in DaCosta v. Laird, *supra*, 471 F.2d at 1151, the Court of Appeals dealt with the question "whether within the context of a lawful war, the President's order to mine the harbors of North Vietnam was properly authorized." It held in that instance (at p. 1155) that judges could not determine "whether a specific military operation constitutes an 'escalation' of the war or is merely a new tactical approach within a continuing strategic plan." However, it added (at p. 1156):

> In so stating, however, we specifically do not pass on the point urged by appellant whether a radical change in the character of war operations—as by an intentional policy of indiscriminate bombing of civilians without any military objective—might be sufficiently measurable judicially to warrant a court's consideration, i.e.,

might contain a standard which we seek in this record and do not find.

The court finds no evidence of intentional bombing of civilians, but the mining of North Vietnam harbors was a part of the war in Vietnam. If bombing in Cambodia is not part of the war in Vietnam, there may be a standard available here which the Court of Appeals did not find in *DaCosta*.

Therefore the manageable standard which this court must apply is the existence of Congressional authority for the present bombing activities over Cambodia, now that American forces have been withdrawn and prisoners of war have been repatriated. In order to be entitled to relief, plaintiffs must show, under this standard, and the test of "continuing mutual participation" set forth in *Orlando*, either that Congress has not participated with the executive in the authorization of the hostilities in Cambodia or that Congress has terminated any such authorization.

### 2. The Extent of Congressional Authorization of Cambodian Hostilities

Cambodia was not mentioned in any of the appropriations bills referred to in *Berk*. The 1964 appropriations bill for the Department of Defense (P.L. 89–18, 79 Stat. 109) referred to "military activities in Southeast Asia." See 317 F. Supp. at 724. But the Department of Defense Appropriations Act for 1968 (P.L. 90–96, 81 Stat. 231, 248, § 639(a)) made appropriations available to support only

> (1) Vietnamese and other free world forces in Vietnam, (2) local forces in Laos and Thailand; and for related costs;

and subsequent authorization and appropriations bills used similar language. See 317 F.Supp. at 726–27.

Ever since the hostilities in Cambodia were announced by the President in April 1970, the appropriations bills have all contained the Fulbright proviso forbidding military support to the government of Cambodia, except in support of

actions to insure the safe withdrawal of American forces or to aid in the release of prisoners of war. *Supra,* p. 555.

The Mansfield amendment referred also to the desirability of an accounting for all Americans missing in action, but this was only in relation to the establishment of a final date for withdrawal of United States military forces from Indochina. *Supra,* pp. 555–556. No Congressional purpose or authorization has been shown for the bombing of Cambodia in aid of persons missing in action, after all known prisoners of war have been released. Other actions by Congress specifically denied any commitment by the United States to Cambodia in its defense (*supra,* pp. 555–556), and the Defense Appropriation Act for 1972, approved a month after the Mansfield amendment, referred only to the withdrawal of United States forces and the release of prisoners of war. *Supra,* pp. 556–557.

The defendants point to the language in the Foreign Assistance Act of 1971, Section 655(d), excluding members of the armed forces engaged in air operations over Cambodia from the limitation on United States personnel in Cambodia, as an authorization for continued bombing. However, the Senate report concerning this bill indicates that the authorization was intended to be correlative with the Fulbright proviso, for it stated (Sen.Rep.No. 92–431, Nov. 8, 1971):

> Section 655 specifically excepts all combat air operations over Cambodia from this ceiling. This exception covers all United States and South Vietnamese combat air operations as well as combat air operations by other countries which involve the expenditure of U.S. funds. This exception is included because of the view of some Committee members that monetary limitations on air operations in Cambodia might jeopardize the continuing withdrawal of U.S. forces from Vietnam.

U.S.Code Cong. & Admin.News, 1972, p. 1897.

Any inference flowing from the negatively phrased exception in Section 656 of the same act would be too indirect a route for Congress to express its will to continue a bombing operation which it had repeatedly questioned. The court does not find such authorization in the Foreign Assistance Act.

The documents described in the statement of facts indicate that Congress did not acquiesce in the Presidential statements that the Indochina war was all of one piece, but rather gave only limited authorization for continued hostilities in Cambodia.

■ Applying principles of the law of agency, as this court did in the *Berk* case, 317 F.Supp. at 728, it is the usual rule that the principal (Congress) may limit the duration of any authorization which it gives to the agent (the Executive). Section 38 of the Agency Restatement of the Law, Second (1958) states:

> § 38. Interpretation as to Duration of Authority
>
> Authority exists only during the period in which, from the manifestations of the principal and the happening of events of which the agent has notice, the agent reasonably believes that the principal desires him to act.

In considering the continued bombing of Cambodia, the removal of American forces and prisoners of war from Vietnam represents a basic change in the situation, which must be considered in determining the scope and duration of any Congressional authorization. The bombing of Cambodia in July 1973 is not "the sort of tactical decision traditionally confided to the Commander-in-Chief in the conduct of armed conflict," as once described by then Assistant Attorney General Rehnquist. Rehnquist, The Constitutional Issues, Administrative Position in 3 Falk, The Vietnam

War and International Law, 163, 173 (1972).

█ The Congressional action before and after the beginning of hostilities in Cambodia does not include authorization to bomb Cambodia in order to achieve a Cambodian cease-fire or even to protect the Vietnamese cease-fire as urged by defendants. The extent of the power granted by Congress depends on the language used by Congress, not on the President's statements to Congress.

██ An emergency does not create power unless Congress has granted it. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 629, 72 S.Ct. 863, 886, 96 L.Ed. 1153 (1952). The Constitution provides (Article II, Section 3) that the President shall recommend to the Congress "such Measures as he shall deem necessary and expedient," and that "he shall take Care that the Laws be faithfully executed." Non-action by Congress does not constitute an implied grant of power. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

The question here is not the one posed by the government, whether aerial action in Cambodia is the termination of a continuing war or the initiation of a new and distinct war; but whether Congress has authorized bombing in Cambodia after the withdrawal of American troops from Vietnam and the release of prisoners of war.

3. *The Effect of the July 1, 1973 Proviso*

Authority to bomb Cambodia was not granted by the provisions adopted by both Houses of Congress on June 29, 1973 and signed by the President on July 1, 1973, forbidding any expenditure of funds in connection with hostilities over Cambodia after August 15, 1973. This is made clear by the statements of Senator Fulbright and others during the debate in the Senate, where Senator Fulbright stated:

> The acceptance of an August 15 cut off date should in no way be inter-

preted as recognition by the committee of the President's authority to engage U.S. forces in hostilities until that date. The view of most members of the committee has been and continues to be that the President does not have such authority in the absence of specific congressional approval.

119 Cong.Rec. S 12560 (daily ed. June 29, 1973).

He reiterated this point in colloquy with Senator Eagleton:

> MR. EAGLETON: I want to inquire as to what this resolution includes. What does it prevent within the next 45 days? Does it permit continued bombing between now and August 15?
>
> MR. FULBRIGHT: As I have said, I do not regard him as having the right to do this. He has the power to do it. And unless we have something like this, the only sanction we have here is to impeach him. And I do not think that is practical. I do not recommend it. I know of no other alternative.
>
> MR. EAGLETON: Would it permit the bombing of North and South Vietnam until August 15?
>
> MR. FULBRIGHT: I do not think it is legal or constitutional. But whether it is right to do it or not, he has done it. He has the power to do it because under our system there is not any easy way to stop him.
>
> I do not want my statement to be taken to mean that I approve of it or think that it is constitutional or legal for him to do it. He can do it. He has done it. Do I make myself clear?
>
> MR. EAGLETON: In a way yes, and in a way no. If we adopt this resolution, the President will continue to bomb Cambodia. That means quite simply that we will sanction it, does it not?
>
> MR. FULBRIGHT: We do not sanction it. It does not mean that we approve of the bombing. This is the best way to stop it. I have never ap-

proved of it. And I do not wish my answer to indicate that I approve of the bombing, because I do not.

MR. EAGLETON: But the President will exercise a power to bomb in Indochina within the next 45 days, is that correct? A power that will now be sanctioned by our action?

MR. FULBRIGHT: The President has the power to do a lot of things of which I do not approve.

MR. EAGLETON: He will exercise that power, and whether he exercises that power wisely, we know that within the next 45 days he will exercise a right to bomb Cambodia—a right given him by the Congress of the United States.

MR. FULBRIGHT: I do not consider that he has the right to do it.

119 Cong.Rec. S 12562 (daily ed. June 29, 1973).

This is not a situation where the views of a few members of Congress, holding attitudes antithetical to the majority, are being proffered to defeat what Congress had intended to be a grant of authority. There is no indication of a contrary majority sentiment. Majorities in both Houses had previously made plain that they were opposed to any continuation of bombing in Cambodia, and they included an August 15 cutoff date merely in order to avoid the veto which had met their earlier efforts.

■■ The defendants urge that Congress' will as expressed through bills which were not enacted cannot be used as a factor in interpreting the July 1 legislation. But this contention misconstrues the basic issue. The question is not whether Congress has affirmatively acted to disavow participation, but whether Congress has acted to authorize the continuation of hostilities in Cambodia. While Congress can exercise its war-making power through measures other than an express declaration of war, courts should not easily infer the exercise of such a grave responsibility. Legislative history as evidenced through bills that were vetoed is relevant to a judicial inquiry of whether or not Congress intended to participate in the military campaign under challenge.

It cannot be the rule that the President needs a vote of only one-third plus one of either House in order to conduct a war, but this would be the consequence of holding that Congress must override a Presidential veto in order to terminate hostilities which it has not authorized.

In order to avoid a constitutional crisis that would have resulted in a temporary shutdown of vital federal activities (including issuance of monthly Social Security checks), due to lack of funds for the new fiscal year, Congress agreed to hold off any action affirmatively cutting off funds for military purposes until August 15, 1973.

This does not reach the question whether such activities had previously been authorized.

The period from now until August 15 is relatively short, the court necessarily having taken several weeks in studying the matter and preparing this memorandum. However, the court cannot say that the Cambodian and American lives which may be lost during the next three weeks are so unimportant that it should defer action in this case still further.

There are no disputed issues of material fact. The issues relate to the interpretation of Congressional acts.

■ Even if part of the fighting in Cambodia is being conducted by North Vietnamese troops rather than by Khmer insurgents, the court has found that there is no Congressional authorization to fight in Cambodia after the withdrawal of American troops and the release of American prisoners of war. Even though the executive and the military may consider Cambodian bombing

an effective means of enforcing paragraph 20 of the Paris Agreement of January 27, 1973, it does not appear that Congress has given its authority for such acts.

There is no indication that any of the classified information mentioned by the government will affect the interpretation of the Congressional acts or that the testimony of the officials suggested as witnesses will do so. The reasons which may have led the executive to continue bombing in Cambodia are not decisive, in the absence of continuing authority from Congress to do so.

There is nothing in the case of Gilligan v. Morgan, —— U.S. ——, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) cited to the court during the typing of the opinion, which is contrary to what has been written above. The Supreme Court in *Gilligan* held that it would be inappropriate for a judge to evaluate the appropriateness of the "training, weaponing and orders" of the Ohio National Guard and establish standards to control the actions of the National Guard. Pp. ——, ——, 93 S.Ct. 2440. What is involved in this case is not the training or tactics of American forces, but whether Congress has authorized the Cambodian bombing. That question is capable of judicial resolution, under the cases cited above, by applying traditional processes of statutory construction.

The court will therefore permit the addition of Captain Donald E. Dawson as plaintiff, and will grant summary judgment for declaratory and equitable relief as set forth in the accompanying judgment, but will postpone the effective date of the injunction until Friday in order to permit the defendants to apply for a stay from the Court of Appeals.

It is ordered that Captain Donald E. Dawson be added as a plaintiff, that plaintiffs have leave to file and serve a second amended complaint in the form proposed, and that the caption be amended accordingly.